*1497.00*
*pd.*

## IN THE CIRCUIT COURT FOR BALTIMORE CITY MARYLAND

Edward L. Howlette, Jr.   *

2986 Turtle Creek Road

Laurel, Maryland 20724-1978  *


NEXGEN, Solutions, Inc.   *

2986 Turtle Creek Road

Laurel, Maryland 20724-1978  *    **CCB09CV0600**


   Plaintiffs    *


v.          *


Hall, Estill, Hardwick, Gable,  *

 Golden & Nelson,

 A Professional Corporation

          *

SERVE: John Rudolph

1120 20th Street, NW    *

Suite 700, North Bldg.

Washington, DC 20036   *

          *

* * * * * * * * * * * *

## COMPLAINT

   Edward L. Howlette, Jr. and NEXGEN Solutions, Inc., by and through undersigned

counsel, complain and allege as follows:

### The Parties

   1.  Edward L. Howlette, Jr. ("Howlette") is an individual residing in Maryland at 2986

Turtle Creek Road in Laurel, Maryland, was and is today the President and CEO of NEXGEN

Solutions, Inc.  At all material times, Howlette was the principal shareholder, President, and

CEO of NEXGEN Solutions, Inc.

   2.  NEXGEN Solutions, Inc. ("NEXGEN") is a corporation organized under the laws of

Delaware with their principal offices located at 2986 Turtle Creek Road in Laurel, Maryland.

1

Between 1996 and 2001, NEXGEN developed a unique and innovative software program designed to revolutionize and streamline procurement procedures for small businesses and federal agencies working under the auspices of the United States Small Business Administration ("SBA").

3.  Hall, Estill, Hardwick, Gable, Golden & Nelson ("Hall Estill") is a professional corporation formed under the laws of Oklahoma, and at all times relevant to this complaint, held itself out to be a national law firm capable of undertaking and prosecuting cases "before all State and Federal Courts and Agencies" including courts in the State of Maryland.  Hall Estill purported to have attorneys working for it that were admitted to practice in Maryland, that were highly capable of representing the Plaintiffs. Hall Estill maintains an office at 1120 20th Street, NW Suite 700, North Bldg., Washington, DC 20036 and offices in Oklahoma City, Oklahoma and Tulsa, Oklahoma, *inter alia*. With respect to litigation matters, Hall Estill claimed that its attorneys would "take a proactive approach with every litigation matter to develop a winning strategy." Hall Estill assured Plaintiffs that it would respond swiftly to protect Plaintiffs' interests and resolve their disputed claims. It represented that it would "deliver timely, const-effective" services. As will be detailed below, none of these representations proved to be true in connection with the work Hall Estill did for Plaintiffs.

**Other Entities**

4.  Meridian Management Group, Inc., Community Development Ventures, Inc., Morgan Advisory Group, LLC, MMG Ventures, L.P., Stanley Tucker, Anthony Williams, Catherine Lockhart, and Timothy Smoot (collectively "MMG") were lenders to (and ultimately active business partners of) Plaintiffs in connection with a series of innovative businesses developed by Plaintiffs. Using Hall Estill's own calculations, Plaintiffs had claims against MMG "in an

2

amount no less than $84,500,000, as compensatory damages, and in amount no less than $253,500,000 as punitive damages." MMG is an agent of the State of Maryland.

5. The Maryland Small Business Development Financing Authority ("MSBDFA") is an agency of the State of Maryland managed by MMG under contract with the State of Maryland.

6. The Department of Business and Economic Development ("DBED") is an agency of the State of Maryland and responsible for the oversight and management of MMG as an agent of the state responsible for the MSBDFA.

7. The entity once known as eScout (now doing business as "Perfect Commerce") was a large competitor of NEXGEN in the electronic commerce industry that was not eligible to participate in Section 8(a) programs.

### Jurisdiction and Venue

8. Hall Estill is subject to the jurisdiction of this court pursuant to Maryland Code Annotated Courts & Judicial Proceedings Article § 6-103(b) in that Hall Estill purported to provide a full range of legal services to the Plaintiffs in the state of Maryland and appeared on behalf of the Plaintiffs in multiple Maryland courts.  Hall Estill represents in its national advertising that it regularly appears in courts and other forums in all states of the United States.

9. Venue is proper in this court pursuant to Maryland Code Annotated Courts & Judicial Proceedings Article § 6-202 in that the actions complained of herein occurred in this jurisdiction.

### Background

10. NEXGEN is a small, minority owned business who was operating as a United States Small Business Administration certified 8(a) Program participant.

11. NEXGEN is a computer software and internet application developer.  NEXGEN identified an opportunity to assist tens of thousands of small businesses in complying with

Federal government procurement contracts by streamline the procurement process for small businesses, making it easier for small businesses to provide goods and services to the Federal government.

12. NEXGEN developed an e-commerce platform, known as SBAExchange, to address the needs of the Small Business Administration and other Federal agencies to procure needed goods and services from small businesses.

13. In late 1999, NEXGEN approached the SBA with an unsolicited offer to develop and implement the e-commerce platform for government procurement programs.

14. In October of 2000, the SBA, through the 8(a) Program, awarded a contract to NEXGEN to develop and operate a website through which Federal agencies could efficiently locate, qualify, and conduct procurement from small businesses consistent with Federal procurement regulations and individual agency spending limits and objectives. This website was the foundation of a new Federal program to be rolled out nationwide by the SBA called SBAExchange.

15. Under the terms of the agreement, NEXGEN would have received millions of dollars in registration fees from small businesses registered to participate in new Federal programs and a two percent per transaction fee of all transactions processed through the SBA's new program.

16. The Defendant valued the SBAExchange contract to be approximately $84,500,000 over the life of the SBA contract.

17. In order to help fund the contracts with the SBA to develop, service and maintain the SBAExchange program, Howlette and NEXGEN entered into a series of lender arrangements with MMG and associated entities, including the State of Maryland through the MSBDFA (operated by MMG).

4

18. In 1999, NEXGEN obtained financing from the MSBDFA to aid in the growth and expansion of the company including the development and testing of the software used to create the SBAExchange program. MMG, as the agent for the State of Maryland, approved and made a series of loans to NEXGEN.

19. Between 1999 and 2003, NEXGEN and Howlette unsuccessfully struggled to advance their work and business under the above-described SBA contract with MMG as the lender, but MMG saw the enormous profit potential of NEXGEN'S contract, improperly used its position to interfere with NEXGEN's contract with the Small Business Administration, attempted to push out NEXGEN out of the SBA contract and attempted substitute itself as the equity owner through a series of schemes described in the attached Exhibit A, more fully described, *infra.*

20. By May 2003, the relationship between NEXGEN and MMG had deteriorated to the point that MMG was threatening Howlette and NEXGEN with an effort to take control of NEXGEN. In response to this threat, Howlette and the NEXGEN contacted the law firm of O'Rourke & Cundra to investigate the possibility of bankruptcy protection and a lender liability claim.

21. Plaintiffs and O'Rourke & Cundra entered into an attorney/client contract by which:

A. Howlette would prepare and file a *pro se* Chapter 13 bankruptcy petition;

B. O'Rourke & Cundra would represent Howlette in bankruptcy including any contested matters and adversary proceedings;

C. O'Rourke & Cundra would represent Howlette and NEXGEN in drafting and pursuing a lender liability claim, and

5

D.  Plaintiffs would pay fees not to exceed $25,000 in the bankruptcy matter and pay fees not to exceed $25,000 for the initial actions in the lender liability action against MMG. Plaintiffs and their corporate counsel at that time Mr. Glenn Garnes, Esq. took extra care to verify these fee limits.

22.  The actions of MMG both individually and as an agent of the State of Maryland, as described in Exhibit A, ultimately led to the frustration and damage to the relationships between NEXGEN and the SBA, State of Maryland, the U.S. Air Force, SMART Technology, IBM and even several of NEXGEN's employees.

23.  Howlette did not have many creditors nor significant assets.  The strategic legal plan was for Howlette to file bankruptcy to prevent the efforts of MMG to seize ownership of NEXGEN and use the bankruptcy as a means to conduct discovery that could be later used to force MMG into a settlement situation and/or greatly reduce the fees necessary in a lender liability action.  The purpose of discovery through the bankruptcy was, in part, to control the costs of a lender liability action by limiting the hourly legal fees.

24.  Additional, legal strategy for Howlette and NEXGEN from the start was to force MMG into a settlement through aggressive early stage litigation prior to or in parallel with efforts to settle with the SBA for its breaches of contract with NEXGEN.

25.  In early 2004, O'Rourke & Cundra merged with the firm of Hall Estill.  Hall Estill held itself out as a national litigation firm highly competent to appear in Maryland courts and represent Plaintiffs in this matter in a proactive, efficient and cost effective way using high tech methods to produce a top quality legal product and to achieve a quick and decisive victory for Plaintiffs. Accordingly, Plaintiffs were assured and (erroneously) believed that their litigation

6

matter with MMG and its co-tortfeasors, including eScout and the State of Maryland was in good hands and would be competently handled.

26. On May 11, 2004, Hall Estill filed with the Bankruptcy Court a Disclosure of Compensation of Attorney for Howlette in which Hall, Estill acknowledged receipt of the retainer of $5,000 and a per hour charge of $250 which had been agreed to by the parties. Hall Estill admitted that the retainer had been received from Howlette on or about August 13, 2003, relating back to the funds paid to O'Rourke & Cundra by NEXGEN to secure representation in order to draft a complaint against MMG and its related entities. Thus Hall Estill knew about the retainer agreements between Howlette, NEXGEN and O'Rourke & Cundra which accompanied the $5,000 retainer.

27. When Howlette and NEXGEN became clients of Hall Estill in the spring of 2004, Hall Estill made no attempt to alter or modify the terms of the "Not To Exceed $25,000 contracts" that Howlette and NEXGEN had with O'Rourke & Cundra, or to have Howlette or NEXGEN sign a modified retainer agreement. Howlette and NEXGEN proceeded on the reasonable relief that the retainer agreement from O'Rourke & Cundra remained in operation.

28. At no time in 2004 or early 2005 did Hall Estill attempt to request a new retainer agreement from Howlette or NEXGEN, or notify Howlette or NEXGEN that it was modifying the original retainer agreement in any way, despite a plethora of opportunities to do so.

29. Near the start of the relationship with Hall Estill, Howlette provided two draft lender liability complaints against MMG, one prepared by Mr. Glen Garnes, Esq., NEXGEN's corporate counsel, and one by Ms. Kelly McCloskey, Esq., a partner for O'Rourke & Cundra. Howlette made clear his desire to have Hall Estill update and add to either or both of these draft

7

complaints in order to minimize the time and expense necessary to draft and file a lender liability complaint.

30.  Through email communications on or about October 6, 2004, approximately six months after becoming a Hall Estill client, Howlette received information that Hall Estill assigned attorney John McDermott and at least one other attorney to the task of examining and preparing a lender liability action against MMG and other entities.  The email stated that the attorneys had completed a review of the documents.  Howlette believed a complaint would be drafted and filed shortly thereafter.

31.  Hall Estill ignored the reasonable request to utilize previously prepared draft complaints as a starting point for drafting the lender liability complaint and decided to start fresh, duplicating work done by two other attorneys, and substantially adding to the time and expense necessary to bring the lender liability action to court.

32.  Beginning in January 2005, nine months after becoming a Hall Estill client, Howlette began questioning Hall Estill attorneys about when the lender liability complaint would be drafted, complaining that it was taking too long to get the complaint drafted and ready for filing as well as reminding Hall Estill of the overall legal strategy which had not been changed.

33.  By February 2005, Howlette, worried that statutes of limitations would expire, again questioned Hall Estill as to when the lender liability case would be filed.  No response was forthcoming.

34.  Throughout the Spring and early Summer of 2005, Howlette regularly asked Hall Estill when a complaint would be readied and filed in the lender liability action.  Howlette warned Hall Estill that MMG was likely to file suit against NEXGEN, outside of the bankruptcy,

and Hall Estill responded saying that the strategy remained unchanged despite no cognizable
work having taken place in order to move the lender liability action forward

35.  After repeated questioning by Howlette, on June 2, 2005, Hall Estill informed that
depositions in the lender liability action would take place on or before July 13, 2005.

36.  On June 30, 2005, Howlette again asked Hall Estill when a complaint in the MMG
litigation would be filed, when depositions would occur and what other discovery efforts would
be undertaken.  Hall Estill still did not respond.

37.  By July 2005, little to no work had been done on the lender liability action by Hall
Estill.  Hall Estill had not filed, or even drafted, a lender liability complaint for filing with the
court.

38.  In a July 29, 2005 telephone conversation, Howlette was told that the MMG
complaint would be drafted by August 10, 2005, some two years behind schedule and after Hall
Estill had been in possession of two draft complaints for over a year.

39.  The August 10 deadline came and went without a complaint being drafted and filed
or any explanation for the delay.

40.  Sometime during 2005, after the lender liability case had languished for the better
part of two years, Hall Estill assigned another attorney, Richard Schwartzman, to the lender
liability case.  Hall Estill informed Howlette that Schwartzman was a "big gun," an experienced
lender liability litigator with extensive experience in government contracting as well.

41.  From March 2004, when Hall Estill assumed the representation of Howlette and
NEXGEN, to September 2005, no cognizable work was performed on the lender liability action,
no complaint was filed, no discovery or depositions taken and no explanation provided to
Howlette or NEXGEN for the lengthy inactivity and delay in the case.

9

42. By September of 2005, the lender liability claim had not moved into litigation and the fees for representing Howlette in bankruptcy were exceeding $25,000 and Howlette was still not in a position to exit bankruptcy, nor had any effort been made to collect discovery for the lender liability action as had been discussed as the legal strategy from the start of the representation.

43. In September of 2005, Hall Estill demanded that Howlette and NEXGEN make a $5,000 payment *in order to draft and file a complaint against MMG.* Howlette objected to this payment since Hall Estill had by this point nearly two years, two draft complaints in their possession to work from and a previously paid retainer of $5,000 from NEXGEN specifically to prepare and file the lender liability complaint. However, desperate to get the case started, Howlette made the $5,000 payment under protest with the understanding that a complaint would be drafted.

44. Without prior notice or discussion, on October 14, 2005, Howlette received, along with another demand for a $5,000 payment, a new proposed retainer agreement. Despite communications from Hall Estill to the effect that a complaint was already being drafted, Hall Estill demanded that both NEXGEN and Howlette personally sign a new retainer agreement **before** proceeding with the MMG litigation, which included the drafting of the MMG complaint. Hall Estill indicated that the new retainer agreement was necessary for them to represent the interests of NEXGEN because the complaint (which Howlette had not seen) would be addressing many claims that belonged to NEXGEN alone, in addition to claims on behalf of Howlette personally. At this point, Hall Estill claimed the previous $15,000 in retainer fees were for Howlette's personal representation. However, the original retainer agreement prepared by

10

O'Rourke & Cundra, which was assumed by Hall Estill by performing work under its terms, indicated that NEXGEN was represented in a lender liability action.

45.  Hall Estill now explicitly represented Howlette individually and NEXGEN, but at no time was there any discussion with Howlette as to the possibility of a conflict of interest between the two entities.

46.  In November of 2005, Howlette agreed to sign the amended retainer agreement on behalf of the Companies but not as an individual, and NEXGEN agreed to pay an additional retainer of $5,000 upon the following conditions:

A.  Hall Estill agreed that the $5,000 payment to be paid by NEXGEN would cover the cost of drafting and filing the MMG complaint on or before December 15, 2005

B.  Hall Estill also agreed that the retainer would be used to conduct initial depositions in the MMG litigation.

47.  By the end of November 2005, Howlette and NEXGEN had paid $10,000 in bankruptcy fees and $15,000 in fees from NEXGEN in order to prepare a lender liability action. In return,  Hall Estill, for over two years, had utterly failed to draft a lender liability complaint and had made little progress in the bankruptcy.

48.  Subsequent to signing the new retainer agreement, Howlette sought to clarify the Not To Exceed $25,000 agreement via email on December 2, 2005.  Hall Estill did not respond or in any way seek to clarify Howlette's understanding of the fee arrangement.

49.  On or about December 9, 2005, Hall Estill filed on behalf of Howlette in the bankruptcy court a consent motion to stay the confirmation of Howlette's reorganization plan and to temporarily allow the claims of MMG in the Howlette bankrupcty.  The effect of this

11

motion and other actions taken by Hall Estill in the Howlette bankruptcy was that the resolution of the lender liability suit became necessary before Howlette could exit bankruptcy.

50. In the December 9 motion to the bankruptcy court, Hall Estill stated that the lender liability complaint would be filed on or before December 15, 2005. This information telegraphed the litigation strategy to MMG's counsel, who was receiving notices and filings in the bankruptcy case.

51. At the time of the December 9 motion, no lender liability complaint had been prepared and presented to Howlette for review. There was also no indication or conversations with Howlette that would indicate a complaint was in the drafting stages.

52. On the afternoon of December 14, 2005, Hall Estill presented to Howlette an utterly unacceptable, indeed incompetent, lender liability complaint for the MMG litigation. Despite having been provided two separate, previously prepared complaints drafted by two different attorneys, the complaint Hall Estill produced spanned a mere four pages in length, did not address all the parties against whom claims were being brought and contained not one claim that belonged to NEXGEN, despite Hall Estill's previous representations regarding the need for the November 2005 retainer agreement and fee.

53. Howlette spent the day before the presentation of the December 14 complaint still explaining the facts of the case to Richard Schwartzman. However, the December 14 complaint was presented to Howlette as the complaint that would be filed.

54. Howlette informed Hall Estill orally and in writing not to file the December 14 complaint and that filing an amended complaint was not acceptable. Some additions were made to the December 14 draft complaint and despite Howlette's instructions, Hall Estill attempted to

file the updated, but still incomplete and factually incorrect, complaint, on December 15, 2005

with the United States Bankruptcy Court for the District of Maryland.

55. Hall Estill failed to properly file or serve the December 15 complaint on MMG and

other defendants, a fact Hall Estill only discovered weeks later after repeated questioning by

Howlette.

56. On or about December 23, 2005, MMG filed a complaint against NEXGEN in the

Circuit Court for Baltimore City, which was served upon NEXGEN on that same day. Howlette

promptly forwarded the complaint to Hall Estill, noting that there were 30 days to file an answer.

57. On or about January 8, 2006, the Bankruptcy Court struck the December 14

complaint from its docket for failure to follow proper procedures in that court.

58. Hall Estill informed Howlette that no answer to the complaint filed by MMG was

necessary since Hall Estill was preparing a motion to have the MMG complaint against

NEXGEN moved to the Bankruptcy court and consolidated with Howlette's personal bankruptcy

and the December 14 complaint. However, such motion was not filed until February 8, 2006,

sixteen days after the answer was due according to Court rules.

59. By January 31, 2006, Hall Estill had failed, after over 22 months of representation, to

produce and serve a complaint recognized by a court upon MMG and other parties in the lender

liability action on behalf of NEXGEN despite being contracted to do so.

60. In early 2006, Richard Schwartzman, the Hall Estill attorney assigned to draft the

MMG complaint, was removed from working on the MMG litigation. Howlette was informed

that Steve Cundra was being assigned to the case. Ironically, Cundra was on of the attorneys

Howelette had worked with at O'Rourke & Cundra. Howlette later learned that the new

attorneys assigned to the lender liability case considered Mr. Schwartzman's work unusable.

13

61. Hall Estill billed Howlette and NEXGEN for the time expended by these new attorneys for familiarizing themselves with a case Hall Estill had allegedly been working on for almost two years.

62. On May 24, 2006, Hall Estill finally prepared and filed a now counter-complaint in the lender liability action, almost three years after Howlette and the NEXGEN companies had retained O'Rourke & Cundra and despite having access to two previously drafted complaints. The Counter-claim was filed six months after the MMG complaint was initially filed against NEXGEN and Howlette. By this time Hall Estill had assigned no less than five attorneys to prepare the lender liability action, with no explanation for the lengthy delays in preparing the complaint.

63. Upon information and belief, Hall Estill badly mishandled the process of consolidation and removal of the disparate lender liability actions and suit by MMG. Hall Estill first removed all actions to the Bankruptcy Court and then asked the Bankruptcy Court to remand the actions to the Circuit Court of Baltimore City and then had the cases consolidated in the Baltimore City Circuit Court.

64. The failure for 26 months of representation of Howlette and NEXGEN by Hall Estill to prepare, file and serve a proper complaint upon MMG resulted in the lapsing of the statute of limitations on causes of action against the State of Maryland, Small Business Administration and eScout.

65. After regular questioning as to why the lender liability complaint focused only on MMG, Hall Estill admitted that the statute of limits as to eScout and the State of Maryland entities, MSBDFA and DBED, had lapsed. Because of the lapsing of the statute of limitations, there is no way to determine the liability of Maryland, the SBA or eScout.

14

66. The long delay filing the lender liability action might possibly have resulted in the lapsing of the statute of limitations as to all potential defendants but for the negotiation and agreement between MMG and NEXGEN of a "stand still" agreement which tolled the statute of limitations for one year for that single entity. As to other potentially liable targets such as eScout, the delay in fact cost Plaintiffs the loss of serious causes of action.

67. By the summer of 2006, other than drafting the complaint and opposing a motion to dismiss the lender liability complaint, Hall Estill performed no substantive work on the litigation. Discovery was in the very early stages and no depositions had been planned or scheduled.

68. By October 2006, Howlette was being told that no work would be performed on the lender liability action until he made a substantial new payment to Hall Estill. October 2006 became one of the largest billing months for the lender liability action despite threats that work would be halted until such time as a payment was made.

69. By November 2006, Hall Estill was actively seeking payment for $150,000 in fees for the lender liability action and $100,000 in fees in the bankruptcy, all without substantial work toward resolving either the lender liability action or the bankruptcy.

70. As Howlette's bankruptcy attorneys, Hall Estill knew Howlette's financial status including the equity in Howlette's home and that the equity was Howlette's only potential source of additional, substantial income at that time. Hall Estill demanded Howlette refinance his house and make a payment as a condition precedent to continuing their representations and the lender liability action .

71. The demand to refinance Howlette's home and make payment to Hall Estill was made with the knowledge that such an effort would be made under less than favorable market conditions at the time due to Howlette's status as a debtor in Bankruptcy.

72. During the fall of 2006, Hall Estill made several representations as to the strength of lender liability action against MMG with the intention that these representations would induce Howlette and NEXGEN to continue to retain Hall Estill. Combined with the intractability of Hall Estill on the matter of payment, Howlette was left with no viable option but to refinance his home in order to obtain funds to pursue the lender liability action.

73. At no time did Hall Estill ever suggest any alternative type of fee arrangement, such as reduced hourly fees and a bonus arrangement or continuing the case on a contingency basis.

74. On or about December 21, 2006, Howlette sought written confirmation that a $50,000 payment and assignment of proceeds, including a UCC Lien, from a related NEXGEN settlement to Hall Estill would be sufficient to resume and conclude the lender liability action. Hall Estill acknowledged that it would be sufficient in verbal communications but refused to put such confirmation in writing.

75. By December 21, 2006, Howlette and Hall Estill agreed to the following.

A. Hall Estill would find a lender willing to refinance Howlette's home despite Howlette's bankrupt status.

B. Hall Estill would obtain permission of the bankruptcy court to refinance the house to obtain funds to pay the litigation expenses.

C. Hall Estill agreed to resume work on and complete the lender liability action through adjudication or settlement.

D.  Howlette agreed to pay $50,000 to Hall Estill immediately upon receipt of the proceeds of the refinance of Howlette's home.

E.  NEXGEN agreed to execute an assignment to Hall Estill of $80,000 from the proceeds of a settlement with the federal government.

F.  NEXGEN consented to a UCC-1 lien against the proceeds.

76.  Hall Estill was aware that the proceeds from the settlement with the federal government were already encumbered by a prior lien held by Industrial Bank and a dispute between Industrial Bank and the Internal Revenue Service as to the priority of various liens on the settlement funds.  Despite this knowledge, Hall Estill, drafted a UCC-1 lien document, presented it to NEXGEN, demanded that NEXGEN sign the UCC-1 lien, and subsequently accepted the UCC-1 lien as partial payment of the obligation to Hall Estill.

77.  In order to keep the long delayed lender liability action moving forward and exit bankruptcy, in December 2006, Howlette was forced to agree to a total combined financial commitment of $130,000 for fees for the lender liability action in addition to the fees already paid, in order to have the MMG litigation prosecuted and completed, a case delayed for more than three years due to the inactions and abandonment of Hall Estill.

78.  On January 5, 2007, Ronald Levin, Howlette's bankruptcy counsel, informed Howlette that he was leaving Hall Estill for the Baltimore-based firm of Semmes, Bowen & Semmes.  Mr. Levin indicated that among the reasons for leaving Hall Estill were the billing practices at Hall Estill.  Mr. Levin indicated that Semmes, Bowen was excited about the prospect of Levin bringing the lender liability action to his new firm on a contingency basis and Howlette gave permission to Mr. Levin to carry the bankruptcy and lender liability cases to Semmes,

17

Bowen.  However a conflict discovered by Semmes, Bowen prevented the move of the lender liability action to Semmes, Bowen.

79.  On March 1, 2007, Howlette was informed that Hall Estill's only Maryland-admitted attorney, John Stackhouse, would be leaving Hall Estill effective March 9, 2007.

80.  Howlette attempted to contact and left extremely urgent telephone messages on March 1, 2007 and March 2, 2007 for John Rudolph, who, upon information and belief, was the managing partner at Hall Estill's Washington, DC office, but received no response from Mr. Rudolph.

81.  After an urgent email on March 5, 2007, John Rudolph finally called Howlette back and informed Howlette that Steve Cundra and Amy Gluck, who along with Mr. Stackhouse and Mr. Levin, were the attorneys at Hall Estill most familiar with Howlette's cases, were also leaving Hall Estill effective March 9, 2007.

82.  With panic setting in regarding the status of his cases, Howlette specifically asked Mr. Rudolph for a plan of action.  Mr. Rudolph responded that he was new to the situation and that he didn't then have a plan, but would call Howlette back as soon as possible with a proposed course of action.

83.  In a letter dated March 8, 2007, without any further inquiry or communication with Howlette, John Rudolph informed Howlette that Hall Estill could find no record of the December 2006 work and fee arrangement to see the lender liability action through to trial or settlement in return for the $50,000 payment made by Howlette, despite communications between Howlette and Hall Estill's billing office regarding the proper crediting of the $50,000 payment.

84.  Also in the March 8 letter, Mr. Rudolph informed Howlette that the very next day Mr. Stackhouse would seek permission from Judge Evelyn O. Cannon of the Baltimore City

Circuit Court to withdraw himself (Stackhouse), Steve Cundra and Hall Estill from the lender

liability action and that Howlette would have to represent himself and NEXGEN pro se.

Rudolph knew or should have known that under Maryland law a corporation cannot be

represented in Maryland courts except through an attorney.   The notice of withdrawal to the

Howlette was given with less than 24 hours notice.

85.  Hall Estill was not permitted to withdraw on March 9, 2007 as verbally requested

before Judge Cannon.  Judge Cannon also refused to alter the scheduling order in the case until

such time as Hall Estill informed her of how the case was going to proceed.

86.  Hall Estill instructed John Stackhouse to inform the Baltimore City Circuit Court and

Judge Cannon that an alternative arrangement had been made to continue the lender liability

action.  Hall Estill, through Mr. Stackhouse and counsel, indicated that Hall Estill would finance

the litigation with the work being performed by another law firm, Roetzel & Andress, under the

direction of Hall Estill.

87.  On or about March 10, 2007, Hall Estill communicated to attorneys at Roetzel &

Andres not to undertake any work until such time as arrangements could be made regarding the

lender liability action.

88.  The period of time immediately following the March 9, 2007  hearing contained

multiple letters between former Hall Estill attorneys, the undersigned and Hall Estill each

confirming a similar set of circumstances, namely that Hall Estill had promised that it would

continue to serve as counsel to Howlette and NEXGEN and make arrangements to continue the

case by financing the litigation on an hourly basis with Roetzel & Andres performing the work.

19

89. Hall Estill's representation to the Court, Howlette and NEXGEN in open court led Howlette to believe that Hall Estill was committed to continue its representation of Howlette and NEXGEN in the lender liability action.

90. According the transcripts of a subsequent hearing, the Baltimore City Circuit Court believed Hall Estill's representations that it would remain counsel to Howlette and NEXGEN and as a result approved a new scheduling order based upon the understanding that Hall Estill was not going to withdraw from the representation.

91. Howlette later became aware that Hall Estill instead retained Maryland counsel to represent *itself* on its motion to withdraw rather than represent Howlette or NEXGEN.

92. On March 19, 2007, Hall Estill informed Howlette that Hall Estill was giving notice to Howlette and NEXGEN of its intention to withdraw.

93. Despite the indication that the March 19, 2007 was notice to the Plaintiffs that Hall Estill was going to file a motion to withdraw, the very next day, Hall Estill filed a notice of withdrawal. An objection was made to the notice of withdrawal and Hall Estill filed a motion to withdraw again without proper notice to Howlette.

94. On April 27, 2007, a hearing was held before Judge Cannon in which she noted that Hall Estill's actions on March 9 were both deceptive and damaging to NEXGEN as NEXGEN has no counsel to represent them. Despite the strong objections of Howlette, acting pro se and NEXGEN without representation, Hall Estill was ultimately permitted to withdraw from the case, leaving Howlette and NEXGEN without counsel in the lender liability action.

95. Hall Estill withdrew from the representation of Howlette in the Bankruptcy Court as both bankruptcy counsel and as special litigation counsel for the lender liability action. However, Hall Estill failed to inform the Bankruptcy Court that Howlette and NEXGEN did not

20

have other representation for the lender liability action, which was required to be completed before Howlette could exit bankruptcy. Hall Estill knew at the time of their withdrawal from the Bankruptcy Court that Semmes Bowen was unable to represent Howlette or NEXGEN in the lender liability action due to conflicts at Semmes Bowen.

96. During the summer and fall of 2007, Howlette and NEXGEN retained new counsel as special litigation counsel in the Bankruptcy Court who then had to duplicate much of Hall Estill's long delayed work. New counsel had to learn the facts of the case, review discovery documents, resolve discovery disputes and attempt to move the lender liability action forward on a tightened scheduled.

97. Due to mounting financial hardships caused and exacerbated by Hall Estill delays during their representation, during January and February of 2008, Howlette and NEXGEN negotiated a settlement with MMG worth $850,000, consisting of cash payments totaling $270,000, a $5,000 contingency payment and the elimination of $575,000 in claims against Howlette and NEXGEN. The financial aspect of the settlement agreement is a far cry from the $84 million dollars that Hall Estill calculated were the damages in the lender liability action.

### COUNT I--Breach of Contract

98. Paragraphs 1-97 are incorporated herein as if stated fully.

99. Plaintiffs and O'Rourke & Cundra had a contract to represent Howlette in bankruptcy and Howlette and NEXGEN in their lender liability action.

100. Upon the merger of Hall Estill and O'Rourke & Cundra, Hall Estill assumed the contract with Howlette and NEXGEN by performing work on the contract without disputing the prior terms, seeking to negotiate a new retainer contract or seeking to clarify the contract terms.

21

101.  Howlette and NEXGEN performed all of their obligations on the contract, including several obligations done under protest and/or duress.

102.  Hall Estill breached the agreement with Howlette and NEXGEN in many ways, including, but not limited to: failing to draft and file a complaint in the MMG litigation for over two years; not pursuing claims against potential defendants in the MMG litigation; missing several deadlines for drafting and filing the MMG complaint that had been promised; failing to see the MMG litigation through to trial or settlement; failing to properly communicate with the Plaintiffs on important matters related to the representation.

103.  Howlette and NEXGEN have suffered damages as a result of Hall Estill's breach of its obligations, including but not limited to; costs associated with the refinance of Howlette's home such as increased cost of the mortgage, closing costs and lender fees; damages from the lost claims against the State of Maryland and eScout due to the running of the statute of limitations; attorneys' fees and costs to retain new counsel in the MMG litigation due; additional bankruptcy costs and fees resulting from the delay in exiting bankruptcy.

**WHEREFORE** Howlette and NEXGEN demand judgment against Hall Estill for compensatory and consequential damages in the amount of $7,000,000.00 and punitive damages in the amount of $10,000,000.00.

### COUNT II–Breach of Contract–Legal Malpractice

104.  Paragraphs 1-103 are incorporated herein as if stated fully.

105.  Hall Estill had a contractual relationship with Howlette and NEXGEN to provide legal services.

106.  Howlette and NEXGEN made good faith efforts in late 2006 to provide Hall Estill with payment despite the lack of productive work performed by Hall Estill, including actions

22

demanded by Hall Estill which were detrimental to Howlette's status as a debtor in bankruptcy such as a demand to refinance Howlette's home on less than favorable terms.

107. Hall Estill used information it obtained from its representation of Howlette in the bankrupcty court to the detriment of Howlette in violation of their duties as attorneys to Howlette.

108. Hall Estill's representations on March 9, 2007 to continue to represent Howlette and NEXGEN were deliberately misleading and a violation of the implied terms of an attorney client contract to conduct themselves in a manner consistent with the Rules of Professional Conduct.

109. Hall Estill had represented on several occasions that it would continue its representation of Howlette and NEXGEN, including representations to the Baltimore City Circuit Court that arrangements had been made to continue the representation by partnering with another law firm to do the work.

110. Hall Estill's efforts to withdraw were made in dereliction of their duty to safeguard the interests of their client in the event they were permitted to withdraw. Hall Estill failed to make proper arrangements to protect the vital interests of their clients prior to their withdrawal.

**WHEREFORE**, Howlette and NEXGEN demand judgment against Hall Estill for compensatory and consequential damages in the amount of $7,000,000.00 and punitive damages in the amount of $10,000,000.00.

### COUNT III–Negligence–Legal Malpractice

111. Paragraphs 1-110 are incorporated herein as if stated fully.

112. Hall Estill knew that it represented two entities, Howlette and NEXGEN, which may and in fact did have opposing interests. For a non-exclusive example, Howlette as a debtor

23

in bankruptcy has substantial wages and salary unpaid by NEXGEN and had a valid claim to be levied against NEXGEN.

113. Hall Estill never disclosed or discussed the conflicting interests of Howlette and NEXGEN nor did Hall Estill attempt or discuss a waiver of such conflicts with Howlette.

114. Howlette was damaged in an amount due to him and the Bankruptcy estate in the amount of wages, salary and/or bonuses due plus indemnification of attorney's fees incurred.

**WHEREFORE**, Howlette demands judgment against Hall Estill for compensatory and consequential in the amount of $250,000.00 and punitive damages in the amount of $500,000.00.

### COUNT IV–Negligence–Legal Malpractice

115. Paragraphs 1-114 are incorporated herein as if stated fully.

116. As attorneys for the Plaintiffs, Hall Estill had a duty to act on their client's behalf with reasonable diligence and promptness in the best interests of the Plaintiffs.

117. Hall Estill breached its duties to the Plaintiffs' in ways that include but are not limited to: failure to act in a prompt and diligent manner in preparing and filing a complaint against MMG for almost three years; failure to respond to Howlette's reasonable requests for information and the status of his case; failure to meet or respond to deadlines for responses to the Court and opposing counsel; failure to serve the December 15, 2005 complaint properly; failure to provide the Plaintiffs with consistent and competent attorneys; allowing statutes of limitations to pass on potential defendants; improper use of Howlette's personal financial situation to the detriment of Howlette; failure to withdraw with reasonable or proper notice and withdrawing from its representation to the considerable detriment of the Plaintiffs.

118. As a direct result of the Hall Estill breaches of its duties to Howlette and the companies regarding the MMG litigation, Howlette and the companies were forced by the long

24

delays to settle the MMG litigation at a value far below the $84,500,000+ value of the case assessed by Hall Estill itself. Plaintiffs had to settle for $270,000.

119. In addition, Howlette and NEXGEN have suffered damages as a result of Hall Estill's negligence, including but not limited to: costs associated with the refinance of Howlette's home such as increased cost of the mortgage, closing costs and lender fees; damages from the lost claims against the State of Maryland and eScout due to the running of the statute of limitations; delay of the MMG litigation of at least another year, prolonging the Howlette's bankruptcy and costing the Howlette additional fees in the bankruptcy; attorneys' fees and costs to retain new counsel in the MMG litigation with no notice.

**WHEREFORE**, Howlette and NEXGEN demand judgment against Hall Estill for compensatory and consequential damages in the amount of $7,000,000.00 and punitive damages in the amount of $10,000,000.00.

### Count V–Legal Malpractice–Loss of Claims

120. Paragraphs 1-119 are incorporated herein as if stated fully.

121. Howlette and NEXGEN had valuable claims against the, SBA, the State of Maryland and eScout stemming from the events surrounding the MMG lender liability action.

122. Howlette and NEXGEN had valuable claims against eScout, the State of Maryland, and the SBA for the tortious interference with a contract and/or tortious interference with an economic relationship and/or civil conspiracy with MMG to the detriment of NEXGEN and Howlette.

123. MMG and eScout had an understanding by which MMG would force NEXGEN to partner with eScout and that eScout would receive revenues from the SBAExchange program

25

and later eScout would purchase NEXGEN at some agreed upon date and mulitple of NEXGEN profits in order to protect MMG's position as an investor in NEXGEN.

124.  eScout engaged in intentional and improper communications with SBA, Members of Congress, the White House Office of Management and Budget, and to MMG calculated to cause damage to NEXGEN's relationship with its biggest customer by creating doubt in the SBA as to NEXGEN's ability to perform its contract with the SBA.

125.  Discussions between the MMG entities and the SBA undermined NEXGEN's ability to negotiate terms of a contract modification with the SBA or to negotiate terms of an 8(a) program compliant sub-contract with eScout and interfered with NEXGEN's ability to perform under its contract with the SBA.

126.  eScout's actions led to SBA's termination of the contract with NEXGEN, resulting in NEXGEN's lost opportunity to at least $84 million in profits and to the frustration and ultimate destruction of the relationship between NEXGEN and MMG/MSBDFA.

127.  Hall Estill knew or should have known that the statue of limitations on tortious interference with contracts or business or economic relations and civil conspiracy was three years.

128.  Hall Estill admitted that the statute of limitations for claims against eScout had lapsed.

129.  But for Hall, Estill's lengthy delays and failure to prepare a complaint against eScout, NEXGEN would have been able to pursue its claims against eScout. NEXGEN and Howlette were harmed by Hall Estill's inaction and failure to timely pursue claims against eScout and suffered damages in amounts of no less than the value of the claims as established by Hall Estill less the value of the settlement achieved in the settlement agreement with MMG.

130. MMG was contracted by the state of Maryland to administer the MSBDFA, a program under which NEXGEN received a loan.

131. As the principal in the relationship between the State of Maryland and MMG, the State of Maryland is liable to third parties for the improper actions of its agent, in this case MMG.

132. Hall, Estill, knew or should have known the procedures to file a tort action against the State of Maryland, which included specific administrative appeal actions, such as a written demand sent to the Maryland Treasurer within one year of the injury to person or property caused by the State of Maryland.

133. Hall, Estill knew or should have known that NEXGEN's injuries caused by the actions of MMG extended into to 2003 through the actions of MMG and should have submitted that required letter to the Maryland Treasurer in 2004, but failed to do so.

134. The submission of a letter to the Maryland Treasurer and the final denial of relief from the Treasurer is a condition precedent to filing a tort claim against the State.

135. But for the failure of Hall Estill to timely file a letter with the Maryland Treasurer, NEXGEN could have pursued its claims against the State of Maryland for the actions of its agent, MMG.

136. But for the failure of Hall Estill to timely file a complaint against the State of Maryland, NEXGEN would have been able to pursue its claims against Maryland. The delay of three years to file the complaint against MMG caused the statute of limitations to pass as to Maryland.

137. Hall Estill's failures caused harm to NEXGEN and Howlette to the extent that it was damaged by Maryland, in an amount equal to the value of the claims established by Hall Estill less $270,000 achieved in the settlement with MMG.

**WHEREFORE**, Howlette and NEXGEN demand judgment against Hall Estill for compensatory and consequential damages in the amount of $7,000,000.00 and punitive damages in the amount of $10,000,000.00.

### COUNT VI–Detrimental Reliance

138. Paragraphs 1-137 are incorporated herein as if stated fully.

139. In the March 9, 2007 hearing before this Court, Hall Estill represented, by direction to John Stackhouse and through counsel, that it had made or would make arrangements to continue representing Howlette and NEXGEN in the MMG litigation by partnering with Roetzel & Andres, and to finance the litigation by paying an hourly fee to Roetzel & Andres.

140. As a result of this promise, made by the direction of Hall Estill by John Stackhouse, Howlette and NEXGEN reasonably believed that Hall Estill would continue their representation. Hall Estill knew or should have known that their promise would induce Howlette and NEXGEN to remain as a client of Hall Estill.

141. In the days immediately following the March 9, 2007 hearing, Hall Estill was afforded an opportunity by the undersigned to substitute in as counsel for NEXGEN and Howlette in the MMG litigation. The offer was ignored.

142. Howlette and NEXGEN did not obtain new counsel until well after the final withdrawal hearing in April of 2007, causing Howlette and NEXGEN to have to obtain counsel under less than optimal conditions.

143.  Howlette and NEXGEN have been damaged to the extent of at least $85,000 in legal fees and costs paid to Gordon & Simmons for their representation of Howlette and NEXGEN in the MMG litigation.

**WHEREFORE**, Howlette and NEXGEN demand judgment against Hall Estill for compensatory and consequential damages in the amount of $7,000,000.00 and punitive damages in the amount of $10,000,000.00.

**WHEREFORE**, Howlette and NEXGEN hereby request any further and such relief as this Honorable Court considers appropriate.

Respectfully Submitted,

Roger C. Simmons, Esq.
Matthew S. Johnston Esq.
Gordon & Simmons, LLC
603-B West Patrick Street
Frederick, Maryland 21701
(301) 662-9122
Attorneys for Plaintiffs

29