# EXHIBIT A

IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

COMMUNITY DEVELOPMENT VENTURES, INC.,   ]
  ]
  ]
     Plaintiff and Counterdefendant,   ]
  ]
v.   ]      Case No. 24-C-05-010843
  ]
NEXGEN SOLUTIONS, INC. and   ]
NEXGEN.COMMERCE, INC.,   ]
  ]
     Defendants,   ]
  ]
v.   ]
  ]
MERIDIAN MANAGEMENT GROUP, INC.,   ]
STANLEY W. TUCKER, ANTHONY   ]
WILLIAMS, CATHERINE D. LOCKHART, and   ]
TIMOTHY L. SMOOT,   ]
Serve:   ]
Registered Agent: Cynthia Tucker   ]
1915 E. 32nd Street   ]
Baltimore, MD 21218,   ]
  ]
MORGAN ADVISORY GROUP, L.L.C.,   ]
Serve:   ]
Registered Agent: Timothy L. Smoot   ]
5863 Arizona Avenue   ]
Baltimore, MD 21206,   ]
  ]
and MARYLAND SMALL BUSINESS   ]
DEVELOPMENT FINANCING   ]
AUTHORITY,   ]
Serve:   ]
Registered Agent: Cynthia Tucker   ]
1915 E. 32nd Street   ]
Baltimore, MD 21218,   ]
  ]
     Additional Counterdefendants.   ]
MMG VENTURES, L.P.   ]
  ]
     Plaintiff and Counterdefendant,   ]
  ]      Case No. 24-C-05-010844
v.   ]
  ]
  ]

NEXGEN SOLUTIONS, INC. and
NEXGEN.COMMERCE, INC.,

              Defendants,

v.

MERIDIAN MANAGEMENT GROUP, INC.,
STANLEY W. TUCKER, ANTHONY
WILLIAMS, CATHERINE D. LOCKHART, and
TIMOTHY L. SMOOT,
Serve:
Registered Agent: Cynthia Tucker
1915 E. 32nd Street
Baltimore, MD 21218,

MORGAN ADVISORY GROUP, L.L.C.,
Serve:
Registered Agent: Timothy L. Smoot
5863 Arizona Avenue
Baltimore, MD 21206,

and MARYLAND SMALL BUSINESS
DEVELOPMENT FINANCING
AUTHORITY,
Serve:
Registered Agent: Cynthia Tucker
1915 E. 32nd Street
Baltimore, MD 21218,

           Additional Counterdefendants.

EDWARD LEE HOWLETTE,

              Plaintiff,

v.

MERIDIAN MANAGEMENT GROUP, INC.,
STANLEY W. TUCKER, ANTHONY
WILLIAMS, CATHERINE D. LOCKHART, and
TIMOTHY L. SMOOT,

            Defendants, and

MORGAN ADVISORY GROUP, L.L.C.,
Serve:
Registered Agent: Timothy L. Smoot

Formerly Adv. Proc. No.: 05-9154, and now consolidated with above cases

5863 Arizona Avenue         ]
Baltimore, MD 21206,        ]
                                                 ]

MARYLAND SMALL BUSINESS    ]
DEVELOPMENT FINANCING AUTHORITY,   ]
Serve:                                  ]
Registered Agent: Cynthia Tucker     ]
1915 E. 32nd Street                    ]
Baltimore, MD 21218,        ]
                                                 ]
         Defendants Added in Amended   ]
         Complaint.                ]

## COUNTERCLAIMS OF NEXGEN SOLUTIONS, INC. AND NEXGEN.COMMERCE, INC. AND AMENDED COMPLAINT OF EDWARD L. HOWLETTE

IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

| | | |
|---|---|---|
| COMMUNITY DEVELOPMENT VENTURES, INC., | ] ] ] | |
| Plaintiff and Counterdefendant, | ] ] | |
| v. | ] ] | Case No. 24-C-05-010843 |
| NEXGEN SOLUTIONS, INC. and NEXGEN.COMMERCE, INC., | ] ] ] ] | |
| Defendants, | ] ] | |
| v. | ] ] ] | |
| MERIDIAN MANAGEMENT GROUP, INC., STANLEY W. TUCKER, ANTHONY WILLIAMS, CATHERINE D. LOCKHART, and TIMOTHY L. SMOOT, MORGAN ADVISORY GROUP, L.L.C., and MARYLAND SMALL BUSINESS DEVELOPMENT FINANCING AUTHORITY, | ] ] ] ] ] ] ] ] | |
| Additional Counterdefendants. | ] | |
| MMG VENTURES, L.P. | ] ] | |
| Plaintiff and Counterdefendant, | ] ] ] | Case No. 24-C-05-010844 |
| v. | ] ] | |
| NEXGEN SOLUTIONS, INC. and NEXGEN.COMMERCE, INC., | ] ] ] | |
| Defendants, | ] ] | |
| v. | ] ] | |
| MERIDIAN MANAGEMENT GROUP, INC., STANLEY W. TUCKER, ANTHONY WILLIAMS, CATHERINE D. LOCKHART, and TIMOTHY L. SMOOT, MORGAN ADVISORY GROUP, L.L.C., and MARYLAND SMALL | ] ] ] ] ] | |

1

BUSINESS DEVELOPMENT FINANCING ]
AUTHORITY, ]
 ]
_____Additional Counterdefendants._____]
EDWARD LEE HOWLETTE, ]
 ]
Plaintiff, ]
 ]
v. ]
 ]
MERIDIAN MANAGEMENT GROUP, INC., ]
STANLEY W. TUCKER, ANTHONY ]
WILLIAMS, CATHERINE D. LOCKHART, and ]
TIMOTHY L. SMOOT, ]
 ]
Defendants, and ]
 ]
MORGAN ADVISORY GROUP, L.L.C., ]
826 E. Baltimore Street ]
Baltimore, MD 21202, ]
 ]
MARYLAND SMALL BUSINESS ]
DEVELOPMENT FINANCING AUTHORITY, ]
826 E. Baltimore Street ]
Baltimore, MD 21202, ]
 ]
Defendants Added in Amended ]
Complaint. ]
_____]

Formerly Adv. Proc. No.: 05-9154, and now consolidated with above cases

## COUNTERCLAIMS OF NEXGEN SOLUTIONS, INC. AND NEXGEN.COMMERCE, INC. AND AMENDED COMPLAINT OF EDWARD L. HOWLETTE

COME NOW, Edward L. Howlette, Jr., Nexgen Solutions, Inc., and Nexgen.Commerce, Inc., Plaintiffs and Counterclaimants, by and through their undersigned counsel, and for the Counterclaims of Nexgen Solutions, Inc., and Nexgen.Commerce, Inc. and Amended Complaint of Edward L. Howlette, hereby state as follows:

## INTRODUCTION

2

NEXGEN is a small, minority-owned business that developed an innovative software program designed to streamline and revolutionize procurement procedures for small businesses and other federal agencies working with the Small Business Administration ("SBA"). A portion of NEXGEN's software development for its product was financed by MMG, a professional asset management company utilizing public economic development and private equity funds. As the value of NEXGEN's proprietary innovative software program increased, MMG, its principals, and affiliates began to position themselves to try to take over the NEXGEN contract with the SBA, and MMG conditioned financing to NEXGEN so as to make NEXGEN completely dependent on it and the public and private funds it managed. MMG used this dependence to attempt to acquire control of NEXGEN and to expropriate its valuable software program for the sole benefit of MMG, its principals and affiliates. They simultaneously engaged in commercial defamation of NEXGEN by passing false negative and detrimental comments to the SBA and prospective NEXGEN investors about NEXGEN and NEXGEN's president, Edward L. Howlette. While violating fiduciary obligations to NEXGEN, as well as federal procurement law and SBA 8(a) program and SBIC regulations, MMG and others bent NEXGEN so far backwards that NEXGEN eventually, and inevitably, broke and lost its contract with the SBA thereby forcing NEXGEN and its founder, Edward Howlette, into debt and personal bankruptcy. This action seeks to hold the responsible parties liable for their contractual breaches and tortious misconduct and recover damages they caused to Plaintiffs and Counterclaimants herein.

## PARTIES AND NON-PARTIES

1.      NEXGEN Solutions, Inc. and NEXGEN.Commerce, Inc. are Delaware Corporations that develop, distribute, and operate a variety of e-businesses and group

3

collaboration products and services.  At all times relevant hereto, NEXGEN Solutions, Inc. was a small minority-owned business under the Small Business Administration's 8(a) minority and women-owned business contracting statute.  At all times relevant hereto, NEXGEN.Commerce Inc. was a subcontractor of NEXGEN Solutions, Inc. and co-signed most of the loans (with one exception where NEXGEN.Commerce obtained the loan directly) described below.  NEXGEN Solutions, Inc. and NEXGEN.Commerce, Inc. are collectively referred to herein as "NEXGEN." NEXGEN developed the concept of an e-commerce marketplace for Federal Government purchases from small businesses.

2.      Edward L. Howlette ("Howlette") is a Maryland resident and was and is today the President and CEO of NEXGEN.  At all times material hereto, Howlette was the principal shareholder, president, CEO, and sole member of the board of directors of NEXGEN.  Howlette filed a <u>pro se</u> voluntary petition under Chapter 13 of the Bankruptcy Code on July 8, 2003.  The case was converted to a Chapter 11 by the U.S. Bankruptcy Court in Maryland on December 23, 2003.  Since then, Howlette has served as a debtor in possession of his estate and is authorized to continue conducting business in the ordinary course pursuant to § 1107 of the Bankruptcy Code.

3.      Meridian Management Group, Inc. ("MMG") is a Maryland Corporation and a professional asset management company for public economic development and private equity funds.  MMG provides an array of financing products and, at all times relevant hereto, managed three (3) comprehensive program funds and an advisory group, identified below, which purportedly were to provide assistance for companies to grow and succeed under leverage opportunities.

4.     The Maryland Small Business Development Financing Authority ("MSBDFA") is a state fund located in Baltimore, Maryland that was created by the Maryland General Assembly in 1978 to assist in the development of socially or economically disadvantaged entrepreneurs in Maryland. MSBDFA's financing activity is supported through the repayment of loans, generation of interest income, and the collection of fees. At all times relevant hereto, MSBDFA was managed by MMG, and MMG acted on behalf of MSBDFA as well as itself.

5.     MMG Ventures, L.P. (the "MMG Fund") is a limited partnership licensed under Section 301(d) of the Small Business Investment Act of 1958 and is a member of the National Association of Investment Companies ("NAIC"). At all times relevant hereto, the MMG Fund was managed by MMG, and MMG acted on behalf of the MMG Fund as well as itself. The MMG Fund invests in small minority-owned and SBA 8(a) program certified businesses (those that are at least 51% owned, controlled, and managed, on a daily basis, by a person or persons whose participation in the free enterprise system is hampered because of social or economic disadvantages) in need of venture capital and/or start-up funding. The MMG Fund is a Small Business Investment Company ("SBIC") certified by the SBA to offer loans and investments pursuant to the rules and regulations of the SBIC program.

6.     Community Development Ventures, Inc. ("CDV") is a Maryland program fund located in Baltimore, Maryland, that, at all times relevant hereto, was managed by MMG. At all times material hereto, MMG acted on behalf CDV as well as itself. CDV makes equity and near-equity investments in businesses located within the Baltimore empowerment and enterprise zones or within other targeted counties in Maryland. The fund gives priority to businesses that employ a significant portion of their workforce from CDV's target areas, aiming to fill at least

5

60% of the jobs in its portfolio companies with residents of distressed urban areas.  In addition to its investments, CDV provides management and technical assistance to its portfolio companies through its Management and Technical Assistance Program.

7.     The Morgan Advisory Group, L.L.C. ("MAG"), an affiliate of MMG, is a Baltimore, Maryland firm that is privately owned by MMG, providing management consulting, capital advisory services, and strategic management consulting services.  MMG advises its portfolio companies through MAG.  According to their website, MAG has consulted with venture capital groups and a wide range of small and emerging businesses, including start-up ventures.

8.     The Small Business Administration ("SBA") is a federal government entity that is engaged, according to its website, in the inspiration of "creativity in the American economy by developing and supporting entrepreneurs through a vast network of resource partners" and advocating "for all small businesses by taking leadership in building a productive partnership between the American people and its government."  The SBA's 8(a) Business Development Program ("BDP") offers support for government contractors, access to capital, management, technical assistance, and export assistance.  The SBA 8(a) BDP builds community-based small businesses, which in turn revitalizes neighborhoods, creates jobs, and encourages economic growth.  The SBA uses several assistance intervention tools, ranging from contract support to low-interest loans for site acquisition, construction, and the purchase of new or upgraded equipment.  NEXGEN brought its concept of an e-commerce marketplace for Federal Government purchases from small businesses to the SBA in 1999.

6

9.      eScout is a Missouri corporation that, in 2003, merged with Perfect Commerce, a Maryland corporation.  Upon information and belief, eScout is a web-based e-commerce and e-business network that delivers on-line commerce and business solutions to independent businesses and provides a venue for allowing businesses to buy and sell business products over the Internet.  At all times material hereto, eScout was not an 8(a) contractor, not minority-owned, and was not a small business.

10.     EZCertify is a minority-owned Maryland corporation that assists women, minority, handicapped and other qualified individuals to successfully apply for and receive certification in the SBA's 8(a) BDP and Small Disadvantaged Business (SDB) Program.

11.     At all times relevant hereto, Stanley W. Tucker was a resident of Maryland and president, CEO, and co-founder of MMG.  At certain times relevant hereto, Mr. Tucker was president and CEO of CDV and the Managing Member of EZCertify.  Previously, Mr. Tucker was the Executive Director of the MSBDFA.

12.     Anthony Williams is a resident of Maryland and a general partner in the MMG Fund.  He is the Vice President and Sr. Investment Officer of MMG.

13.     Catherine D. Lockhart is a general partner in the MMG Fund and a resident of Maryland.  She is the Executive Vice President and COO of MMG and CDV, a member of the CDV Board of Directors, and, according to CDV's website, a principal of the corporate General Partner for the MMG Fund.

14.     Timothy L. Smoot is a general partner in the MMG Fund and is a resident of Maryland.  He is the Senior Vice President and CFO of MMG.  Before co-founding MMG, Smoot was the Deputy Director of the MSBDFA.

7

## JURISDICTION AND VENUE

15.     Jurisdiction and venue are proper in this court pursuant to Md. Code Ann. § 1-501 (2006).  Venue is further proper in this court pursuant to the Order of the United States Bankruptcy Court for the District of Maryland (Baltimore), dated April 10, 2006, remanding all claims between these parties to the Circuit Court for Baltimore City.

## FACTS

16.     At all times relevant hereto, and in connection with all dealings with NEXGEN, MMG and/or its principals were acting as the authorized agent of the MMG Fund, MSBDFA, MAG, and CDV with all actions being taken by the same principals of MMG in connection with the loans and investments extended to NEXGEN.

17.     At all times relevant hereto, MMG, CDV, MAG, and the MMG Fund acted as Licensees under Section 301(d) of the Small Business Investment Act of 1958 and were bound by the regulations set forth in the Code of Federal Regulations Title 13, Chapter 1, Part 107.

18.     Between 1996 and 1999, NEXGEN identified major problems existing in the federal procurement process, especially concerning relatively small transactions of $100,000 or less, which accounted for more than 90% of the actual federal purchasing activities.  By federal law, all procurements between $2,500 and $100,000 are to be set aside for small businesses.

19.     Some of the problems in the federal procurement process that NEXGEN identified are as follows:

a. For small businesses, selling to the government was costly, complicated, administratively burdensome, resource intense, and intimidating;

b. The transactions most frequently conducted by federal agencies encouraged fraud, waste, and abuse, including flagrant violation of procurement regulations; and

8

        c. Citizens and small businesses were paying big dollars for committees and federal task forces to "explore" problems that failed to produce solutions.

20.     To combat the problems in the federal procurement process, NEXGEN created software-based processes and technologies, and devised an approach for implementation of these solutions on a national basis, which were and are collectively referred to herein as "NEXGEN Proprietary Information."

## THE FIRST LOAN FROM AN MMG-CONTROLLED ENTITY, PUBLIC AGENCY MSBDFA, AND AWARD OF THE SBA CONTRACT

21.     In or about May 1999, NEXGEN applied and was approved for a $500,000 loan from the MSBDFA, which was administered by MMG, to provide start-up capital for NEXGEN to complete certain final refinements to its technology and to secure contracts with the SBA for the implementation and operation of NEXGEN Proprietary Information. At closing, the MSBDFA disbursed $250,000 to NEXGEN in accordance with the loan terms.

22.     The second half of the $500,000 loan from MSBDFA was to be disbursed once NEXGEN obtained approximately 200 customers through its anticipated contract with the SBA.

23.     Subsequently, NEXGEN received notice that MSBDFA had authorized and approved a line of credit. However, MMG never provided the details or documentation of this line to NEXGEN so that NEXGEN could draw down on it.

24.     In reliance on lines of authority established through written confidentiality agreements and the fiduciary obligations inherent to investor/shareholder relations, NEXGEN disclosed and discussed confidential contract data, customer account information, and details regarding NEXGEN Proprietary Information with MMG representatives.

9

25.     At the end of 1999, NEXGEN approached the SBA with its software to determine if the NEXGEN Proprietary Information could be used to assist small businesses and federal agencies.

26.     Early in 2000, the SBA expressed its, and other agencies', willingness (indeed, "excitement") to utilize NEXGEN's Proprietary Information.

27.     On or about October 19, 2000, NEXGEN was awarded a contract by the SBA for five (5) years, on a sole source basis, through the SBA's 8(a) program, for the nationwide implementation and operation of the NEXGEN Proprietary Information into an e-commerce marketplace to be known as "SBA Exchange."

28.     At all times relevant hereto, MMG was aware that SBA 8(a) program regulations required that Howlette, upon which NEXGEN's 8(a) program certification was based, *was required* to remain the majority shareholder, unconditionally control the day-to-day operation of NEXGEN, and receive the highest level of compensation among all NEXGEN employees, in order to maintain the SBA's 8(a) certification and any contracts awarded to NEXGEN through the program.

29.     Any proposed changes to the ownership structure (by stock or warrant) and control of NEXGEN required advance SBA approval, and failure to obtain such approval could result in the termination of NEXGEN's 8(a) certification and any contracts awarded through the 8(a) program.

30.     The terms of the SBA contract required NEXGEN to implement and operate the NEXGEN Proprietary Information as the foundation of a new official federal contracting and business development program administered by the SBA, under the name "SBA Exchange."

10

The original contract terms called for NEXGEN to receive an annual fee of approximately $3,000.00 for each Supplier who registered to participate in SBA Exchange plus two percent of the gross dollar amount of any and all transactions completed using SBA Exchange.

31.     Based on the SBA's stated intentions for Government-wide roll out, the total initial contract value was in excess of $84,500,000.00 in profits alone over the term of the contract.

32.     Further, because implementation of this solution included integration with existing long-used critical procurement systems and automatically generated reports required by agencies and requested regularly by members of Congress, upon expiration of the initial contract, there would be further contracts because the NEXGEN Proprietary Software filled a niche within the Federal Government that was not, and is still not, being addressed by any competitive solution.

33.     In meetings with NEXGEN's counsel, SBA officials stated that use of the SBA Exchange technology Government-wide was contemplated for managing purchase card actions (*i.e.*, government credit cards) which, according to the SBA, accounted for $15 billion in annual spending activity.

34.     Since the Federal Government's small business contracting goal for spending activity is 23%, NEXGEN would be entitled to 2% (according to its contract with the SBA) of such spending, which would result in profits of approximately up to $69,000,000 per year.

35.     After NEXGEN obtained the SBA contract, Howlette approached MMG seeking an investment of $3,000,000.00 to fund completion of its software, acquisition and setup of

11

hardware, setup of a customer support operation, performance of SBA contract obligations, and servicing of existing debts including past due federal tax obligations.

36.    MMG, through MAG and on behalf of the MMG Fund and CDV, commissioned Michael Miller, an affiliated financial consultant, to complete a professional evaluation of the funds necessary to provide NEXGEN with sufficient capital to perform its obligations under the SBA contract and operate the business. Mr. Miller first concluded that NEXGEN would require between $2 and $3 million dollars for this venture and so notified MMG.  MMG instructed Miller to re-work the figures so that performance could occur with the provision of $1 million or less from one of the funds controlled and managed by MMG.  Inexplicably, this conclusion considered forward operations only and made no provision for the servicing of existing and substantial debts incurred by NEXGEN in the creation of the NEXGEN Proprietary Information.

**THE SECOND LOAN: A $75,000 BRIDGE LOAN FROM CDV**

37.    On or about July 5, 2001, NEXGEN and CDV (which was managed by MMG), entered into a written loan agreement for $75,000, which was to serve as a ninety (90) day bridge loan to cover operating expenses for NEXGEN while the parties finalized paperwork for a larger financing to be provided jointly by CDV and the MMG Fund.  At the time that CDV made the bridge loan, MMG informed NEXGEN that the loan would be re-paid from the proceeds of an initial larger financing of what was to be $500,000.

38.    In reliance on the larger financing from MMG as the source of repayment for the ninety (90) day bridge loan from CDV, Howlette agreed to provide CDV with a lien on his primary residence as partial security for this short-term loan.

39.    NEXGEN and Howlette agreed to the terms of the bridge loan on the sole

12

condition that the bridge loan was to be paid in full upon the execution of the larger $500,000 loan from MMG, which was scheduled to close within ninety (90) days of execution of the bridge loan.

40.     Based on the due diligence disclosures, MMG knew that NEXGEN had substantial unpaid state and federal withholding taxes, several significant debts to priority secured lenders (including MSBFDA), and no means of repaying the $75,000 bridge loan to CDV without the larger financing that had been promised.

41.     In the latter half of 2001, MMG provided a portion of the larger financing, even though MMG and CDV both knew that NEXGEN had no way to repay the bridge loan without full funding or fulfill its performance obligations.

## THE THIRD LOAN:  THE FIRST OF TWO LOANS OF $500,000 FROM THE MMG FUND

42.     On or about September 13, 2001, NEXGEN entered into a written agreement for the MMG Fund to provide $225,000 in additional funding (later increased by MMG to $500,000), of which MMG demanded that approximately $40,000 be passed through NEXGEN for the benefit of EZCertify, one of MMG's portfolio companies.  The "pass-through" of closing proceeds was part of a larger requirement imposed by the MMG Fund, after extending the $75,000 bridge note, that called for NEXGEN to enter into a joint venture with EZCertify and provide that company with financing, labor, and support necessary to develop an internet-based software program that MMG believed was critical to the future success of EZCertify, at the sole expense of NEXGEN and over NEXGEN's continuous objections.

43.     Upon information and belief, MMG had made substantial investments in

13

EZCertify, and officers of MMG were officers of EZCertify, who were at that time running the daily operations of EZCertify.

44.     Upon information and belief, MMG could not directly provide any additional funding to EZCertify through the MMG Fund or CDV due to conflicts of interest and/or regulatory limitations on the lending it was allowed to extend to EZCertify because MMG had already reached the legal lending limit with EZCertify.  MMG required the pass-through of approximately $40,000 to EZCertify as a prerequisite condition of the $500,000 loan to NEXGEN; and, when NEXGEN refused, MMG threatened to call the $75,000 bridge loan from CDV into default and threatened to foreclose on Howlette's residence.

45.     Beginning in or about August 2001, the principals of MMG, the MMG fund, MSBDFA, CDV, and MAG continuously interjected themselves in the day-to-day operations of NEXGEN.  For example, MMG required NEXGEN to enter into the aforementioned joint venture agreement with EZCertify and divert NEXGEN resources for the sole benefit of EZCertify.  MMG threatened NEXGEN with refusal to disburse additional funds it had promised if NEXGEN refused to comply.  When NEXGEN objected to this arrangement, MMG threatened to kill the $500,000 loan, declare a default on the CDV bridge loan (which MMG knew could not be repaid absent the $500,000 loan), and foreclose on Howlette's residence.

46.     At the direction of MMG, in September 2001, NEXGEN met with the EZCertify CEO and entered into an oral agreement that provided for NEXGEN to receive approximately $100,000 for the development of an internet-based version of EZCertify's software program.

47.     MMG further demanded that NEXGEN develop the software for EZCertify and charge them only the actual cost of the labor used to build it, promising that MMG would

14

reimburse NEXGEN for those costs.  MMG then had their attorney draft the documentation for

the Joint Venture, at NEXGEN's expense, and had themselves included as a payee for

EZCertify's share of the agreement. .

    48.    On or about October 4, 2001, the parties executed the official loan agreement for

the initial $500,000 from the MMG Fund and related documents.  However, MMG disbursed the

loan proceeds to NEXGEN piecemeal, at their discretion, and only after reviewing detailed use

of proceeds reports that were required to accompany every disbursement request submitted to

MMG for consideration.  Further, though a portion of this first $500,000 investment was to be

used to repay CDV for the bridge loan, at closing on this loan, MMG prohibited NEXGEN from

using the proceeds for repayment of the CDV note.  MMG informed NEXGEN that the CDV

bridge loan would be repaid from proceeds of the second $500,000 financing to come.

    49.    The loan documents drafted by MAG provided the MMG Fund with the

opportunity to secure an equity position with NEXGEN by providing the MMG Fund with two

stock warrants.  Under the terms of one of the stock warrants, the MMG Fund was granted the

right to obtain a 19.79% equity interest in NEXGEN by paying $1.00 per share.  The MMG Fund

could obtain an additional equity interest by converting its debt to equity at the rate of $1.00 of

debt for 1.00 share of common stock, provided they had first obtained shareholder approval.

Provisions in the stock warrant agreement regarding NEXGEN's right to buy back the warrants

were required to, but did not, comply with various SBA regulations, namely the term under

which NEXGEN should have been entitled to repurchase the warrants.

15

50.     If NEXGEN refused to agree to MMG's terms, MMG threatened to declare the CDV bridge loan in default and foreclose on Howlette's residence. Howlette requested that the loan documents be submitted to the SBA for their approval, but MMG refused.

51.     As part of the October 4, 2001 financing, Howlette was forced to execute a stock pledge in favor of the MMG Fund, which included a provision giving the MMG Fund the right to sell the pledged stock if NEXGEN defaulted on the loan. However, the stock pledge agreement provided Howlette with the preemptive right to first exhaust all reasonable efforts to obtain payment from any other liable party and from the liquidation of other collateral before the MMG Fund could sell the stock.

52.     Following consummation of the October 4, 2001 funding by the MMG Fund, Howlette requested that loan proceeds be advanced to liquidate the CDV bridge loan as previously agreed by the parties. However, CDV instructed Howlette not to use those proceeds to pay off the CDV obligation and stated that CDV would wait until the close of the next loan and restructuring once the contract modification was obtained from SBA to allow the $75,000 bridge loan to be repaid.

53.     In or about December 2001, MMG, CDV, and MSBDFA began insisting that NEXGEN change its SBA contract-pricing model by lowering the prices to be paid by small business participants from $3,000.00 to $1,020.00. MMG wanted to collect these fees in twelve equal monthly installments even though MMG knew that NEXGEN was relying on these revenues to support its operations and performance of its SBA contract obligations. The SBA did not request the pricing model changes. However, MMG principal Anthony Williams said, "If you want our money you will do what we say." NEXGEN agreed to reduce the price if

16

MMG agreed to execute a written commitment outlining the essential terms of the long-promised second $500,000.00 financing, which MMG did.  The reduced SBA price change was incorporated into the final SBA contract modification.

54.     In April 2002, SBA surveyed the small business community for its willingness to participate in the SBA Exchange program developed by NEXGEN.  Out of 5,125 respondents surveyed, 4,623 - or *more than 90%* - indicated that they would be interested in participating in the program.  Following a series of demonstrations to federal agency procurement officials, SBA indicated that fifteen (15) federal agencies also expressed interest in using the program.

## THE FOURTH LOAN:  THE SECOND $500,000 LOAN FROM THE MMG FUND AND CDV

55.     On or about May 8, 2002, NEXGEN and MMG executed a term sheet for the restructuring of the existing debt and an additional $500,000 to be advanced by the MMG Fund once Howlette agreed to lower his prices to the SBA and once the modification occurred.  Under the provisions of the term sheet, the new loan terms would mirror those from the first loan, pro rata, with the exception of a buy-back provision, which was to be negotiated.  It was intended that these funds would be used, in part, to repay the $75,000 bridge loan from CDV.

56.     On September 30, 2002, SBA issued the first contract modification with NEXGEN's lower prices, which specified that participating suppliers would be charged a reduced annual license fee of $1,500 per year and re-affirmed several other types of fees that NEXGEN would be entitled to receive, including a transaction fee equal to 2% of the value of each transaction conducted through SBA Exchange.

17

57. On August 5, 2002, MMG and NEXGEN executed a $75,000 Revolving Line of Credit Agreement, which was secured by NEXGEN's receivables that it managed in accordance with the terms of the Agreement and the understanding of the parties.

58. On October 3, 2002, following receipt of the contract modification by the SBA, Anthony Williams of MMG forwarded the proposed closing documents for the second $500,000 financing. These documents were inconsistent with the terms of the commitment executed on May 8, 2002 and substantially changed the pricing in MMG's favor.

59. In the fall of 2002, without notice or good cause, MMG deliberately and wrongfully began declining NEXGEN's requests for disbursement under the Agreement in an attempt to force NEXGEN and Howlette to accept the material changes made to the second term sheet for the second loan of $500,000.

60. Immediately thereafter, when NEXGEN had signed approximately 400 customers (which was twice the amount needed to trigger the second disbursement of $250,000 from the MSBDFA loan), NEXGEN requested release of the second $250,000 from MSBDFA from the 1999 loan. Though the contingency stated occurred, MMG refused, and maintained that the second disbursement of $250,000 was no longer available.

61. Title 13 C.F.R. § 107.830(b) provides that an SBIC must, at a minimum, provide financing for one (1) year, and if an SBIC acquires stock warrants on terms that include redemption by the small business, it must not require redemption by the small business within the first year of the acquisition.

62. Contrary to the program regulations, MMG, through the MMG Fund, required redemption by NEXGEN within the first year of MMG's acquisition in the October 2002 stock

18

warrant agreement executed by the parties.  The agreement also provided the MMG Fund with

the opportunity to exercise two stock warrants to secure an equity position with NEXGEN.

63.     By the start of 2003, NEXGEN had signed up approximately 520 companies to

participate in SBA Exchange and received more than $500,000 thus enabling it to begin paying

off the MMG loan.

## MMG CONSPIRES WITH A NEW COMPANY, ESCOUT, TO CONTROL THE PERFORMANCE OF NEXGEN'S SBA CONTRACT

64.     Upon information and belief, in or about December 2002, MMG learned of

eScout, a direct competitor of NEXGEN, and a non-8(a) contractor.

65.     In or about January 2003, MMG met with the SBA and eScout (without Howlette

or NEXGEN's knowledge) and discussed eScout's ability to perform NEXGEN's contract.

Further, MMG represented to the SBA that NEXGEN would subcontract with eScout and/or that

eScout would mentor NEXGEN through SBA's mentor-protégé program.  Following this

meeting, MMG demanded that Howlette meet with eScout to discuss a sub-contract.

66.     At NEXGEN's meeting with eScout, eScout's CEO informed NEXGEN that it

had discussed an arrangement with MMG whereby eScout would purchase NEXGEN.  After this

meeting, MMG began demanding that NEXGEN enter into an agreement with eScout that would

vest control of the SBA contract performance (and the contract value) with eScout using

eScout's technology instead of NEXGEN's technology.

67.     Although NEXGEN's counsel informed MMG that such an arrangement with

eScout was a violation of federal procurement law, MMG was unwavering in their demand and

threatened to declare the CDV bridge note in default thereby triggering a technical default on the

19

$500,000 note from the MMG Fund and foreclosing on Howlette's residence if NEXGEN did not contract with eScout.

68.　Upon information and belief, between December 2002 and February 2003, MMG wrongfully represented to the SBA that an agreement would be reached between NEXGEN and eScout.  In reliance on this misrepresentation, the SBA then notified other governmental agencies, including the White House Office of Management and Budget ("OMB"), that eScout was part of the delivery team on the SBA Exchange contract.  Simultaneously, MMG began threatening to reveal to the Internal Revenue Service ("IRS") that NEXGEN was behind on payment of its withholding taxes.

69.　In the summer of 2003, MMG began efforts to have the SBA contract cancelled and re-awarded to another minority-owned business in which MMG had investments.  MMG needed a company who would work with eScout to go forward with the project since NEXGEN would not agree to the additional terms that MMG attempted to force on NEXGEN just prior to closing on the second $500,000.00 loan and further refused to violate federal procurement regulations governing sub-contracting on contracts awarded through the 8(a) program by turning over control of the operation of the contract to eScout, who was not an 8(a) contractor.

70.　MMG promised a substantial portion of the revenue generated by NEXGEN in the SBA Exchange to eScout for eScout to use its technology (rather than NEXGEN's) even though MMG knew that NEXGEN needed these funds to repay the first $500,000 note from MMG and other debts.

71.　In April 2003, NEXGEN and eScout met with the members of the GSA's Integrated Acquisition Environment ("IAE") team and officials from the OMB to present the

20

technical aspects of how NEXGEN and eScout planned to work together to deliver SBA Exchange.

## MMG'S SELF-DEALING AND INTERFERENCE WITH NEXGEN'S BUSINESS AND THE SBA CONTRACT CAUSES LOST REVENUE TO NEXGEN AND DIRECTLY CAUSES THE SBA TO CANCEL ITS CONTRACT WITH NEXGEN

72.    Upon information and belief, between the summer of 2002 and summer of 2003, MMG consistently communicated secretly and directly with SBA officials regarding NEXGEN and the performance of its contract despite demands by both NEXGEN and the SBA Contracting Officer that there should be no further direct communication between principals of MMG and SBA officials regarding the NEXGEN contract.

73.    MMG further interfered with the SBA contract by providing the SBA with confidential financial information about NEXGEN and personal information about Howlette, with the intent to make the SBA uncomfortable with Howlette's ability to manage NEXGEN and NEXGEN's ability to perform the contract in the absence of additional funding from MMG.

74.    In response to the confusion and concerns raised primarily by false and misleading information communicated to the SBA by MMG regarding NEXGEN and Howlette, SBA issued a stop work order on March 12, 2003 for the stated reason of re-evaluating the SBA Exchange program with the IAE team and the OMB.

75.    Also in 2003, MMG attempted to solicit congressional assistance to replace NEXGEN on the SBA contract and discouraged other lenders and executive team personnel from joining NEXGEN and/or providing NEXGEN with financing to pay off outstanding obligations to the MMG Fund.

21

76.     At the same time that MMG was pressuring NEXGEN to subcontract with eScout in 2003, MMG interfered with contracts entered into by NEXGEN with other subcontractors, namely, a contract with SMART Technology, Inc., which provided for SMART to receive a percentage of revenues to be generated under the SBA contract, in lieu of being paid up-front for their services.  MMG encouraged NEXGEN to breach its agreement with SMART and discouraged SMART from making a $300,000 investment in NEXGEN as part of its scheme to keep NEXGEN financially dependent on MMG and so eScout could perform the functions that SMART was already performing.

77.     When principals at NEXGEN objected to the above-listed conduct by MMG and entities controlled by MMG, Anthony Williams said "If you want our money, you'll do what we say," threatened to refuse further funding, and attempted to declare NEXGEN in default on the CDV loan, which would also trigger a technical (for non-payment) default on the $500,000 loan, despite the fact that the MMG fund's own conduct in failing to disburse funds from the first $500,000 loan to pay off the CDV loan, interference with NEXGEN's operations, and refusal to fund the agreed second loan, had impeded and interfered with NEXGEN's ability to honor the loan terms.

78.     Pursuant to 13 C.F.R. § 107.710, as an SBIC, the MMG Fund, as managed by MMG, was required to finance "smaller enterprises."  Pursuant to § 107.710(f), an SBIC is not permitted to finance a company if the proceeds are to be used for purposes contrary to the public interest or are in violation of law.

79.     MMG violated 13 C.F.R. § 107.710 by:

a. demanding that NEXGEN enter into an agreement with MMG that clearly violated SBA 8(a) Program regulations that governed the SBA-NEXGEN contract and NEXGEN's continued qualification as an 8(a) program participant;

b. demanding that NEXGEN pay over to EZCertify funds that MMG had loaned to NEXGEN for unpaid salary of EZCertify employees, without deducting the required withholding taxes; and

c. demanding that NEXGEN enter into an agreement with eScout that violated federal procurement regulations since eScout was not minority-owned or an 8(a) contractor..

80.      MMG and the MMG Fund violated provisions of 13 C.F.R. § 107.730, which

prohibits "self-dealing" to the prejudice of a small business, the licensee, its shareholders, or

partners, or the SBA without the prior written approval of the SBA and regulates "conflicts of

interest," as follows:

a. MMG had demanded that approximately $40,000 of the funding that they had agreed to provide to NEXGEN be passed through NEXGEN to EZCertify, a company in which MMG had invested and in which MMG shared officers, as a pre-requisite of the loan to NEXGEN. This was part of a larger requirement imposed by the MMG Fund, after CDV extended the $75,000 bridge note that called for NEXGEN to enter into a joint venture with EZCertify and provide that company with financing, labor, and support necessary to develop an internet-based software program, at the expense of NEXGEN.

b. MMG attempted to merge EZCertify and NEXGEN to ensure its investment in EZCertify.

c. MMG demanded that NEXGEN provide the labor for the development of the software program at cost of labor to EZCertify, which they stated they would reimburse (but never did), and then wait to be paid from the proceeds of the sale of the operating product.

d. MMG demanded that NEXGEN enter into an agreement with eScout that would vest control of the SBA contract performance (and the contract value) with eScout using eScout's technology instead of NEXGEN's technology because MMG wanted to ensure its investment in NEXGEN with the participation of a larger business and to eventually attempt to sell equity in NEXGEN to eScout.

e. When NEXGEN objected to these arrangements, MMG threatened to declare the CDV bridge loan in default (which they prevented NEXGEN from repaying by withholding funds designated for that purpose and knew could not be repaid absent the $500,000 loan from MMG).

23

81.     The SBA stop work order was extended until August 7, 2003, at which point NEXGEN received a Show Cause letter from the SBA stating its intention to cancel the SBA Exchange contract based on information provided to them by MMG. Based on the information provided by MMG, the SBA alleged that NEXGEN had not paid employee payroll taxes, defaulted on a bank loan, and questioned Howlette's leadership of NEXGEN.

82.     Also in August 2003, MMG informed NEXGEN that it was not willing to invest any additional money into NEXGEN unless it worked out a deal with eScout.

83.     After NEXGEN refused to buckle under the unconscionable pressure being exerted by MMG through MMG's wrongful and deliberate actions, MMG initiated the first of several suits against NEXGEN (that have all been dismissed), alleging that NEXGEN was in default of the $500,000 loan as the loan documents at issue make it a default under the terms of this loan for NEXGEN to be in default under the terms of any other loan in which the MMG Fund participates.

84.     All along, MMG has exerted control and pressure over NEXGEN by refusing to allow NEXGEN to repay the CDV loan, which involved public funds. This way MMG was, at all times, continuously able to threaten NEXGEN with a default. MMG did not declare a default so it could represent as much to its public affiliates, while at the same time, MMG could (and did) coerce NEXGEN by having the ability to declare a default at any time, which would trigger a non-economic default of the $500,000 loan by the "cross default" provisions thereby keeping a perpetual "sword of Damocles" over Howlette and NEXGEN's head.

85.     On December 11, 2003, as a consequence of MMG, its principals, and its

24

affiliates' interference, SBA terminated its contracts with NEXGEN for the convenience of the Government.

86.     As a result of all of MMG's wrongful actions and attempts to take control of NEXGEN by foreclosing on Howlette's stock, Howlette filed for voluntary bankruptcy protection in July 2003 under Chapter 13 of the Bankruptcy Code.  The Bankruptcy Court converted the case to Chapter 11 on December 23, 2003.

## COUNT I
## BREACH OF FIDUCIARY DUTIES
### (Against MMG, CDV, the MMG Fund, MSBDFA, Tucker, Williams, Lockhart, and Smoot)

87.     NEXGEN and Howlette hereby incorporate by reference the allegations made in paragraphs 1 through 86 above, and reallege them as though fully set forth herein.

88.     As a result of the continuing pattern of activities in which the individual defendants, in their individual capacities and as agents of several of the defendant corporate entities, participated as and along with MMG, CDV, MSBDFA, and the MMG Fund to interject themselves into the business and affairs of NEXGEN and exercise of control over NEXGEN, MMG, CDV, MSBDFA, and the MMG Fund abandoned their role as lenders to NEXGEN, and became fiduciaries of NEXGEN.

89.     As fiduciaries, MMG, CDV, MSBDFA, and the MMG Fund (who was also an SBIC) owed a fiduciary duty to NEXGEN not to engage in conflicts of interest and self-dealing at the expense of NEXGEN or its shareholders, had a duty to promote the best interests of NEXGEN, and had a duty to refrain from damaging NEXGEN 's contractual opportunities and relationships.

25

90.    MMG, CDV, MSBDFA, and the MMG Fund (as well as the individual defendants who acted as agents of these entities) breached said duties by:

a. Conditioning loans to NEXGEN on its agreement to enter into a joint venture with EZCertify, a financially troubled company in MMG's portfolio with substantial debts to MMG;

b. Requiring that funds loaned to NEXGEN to perform its contract with the SBA be paid over to EZCertify as a condition for further disbursements and future investments when MMG had a substantial investment in EZCertify and officers of MMG were acting as officers of EZCertify;

c. Interfering with the contract negotiations between NEXGEN and EZCertify by demanding that MMG structure and draft the agreement between the parties and demanding their inclusion as payees as a condition for further disbursements and future investments from MMG;

d. Failing to inform NEXGEN that the MMG Fund was a Small Business Investment Company prior to accepting any fees or disbursing any funds;

e. Wrongfully declaring NEXGEN to be in default under the terms of the $500,000.00 investment without a default having occurred;

f. Wrongfully accelerating the $500,000 note even though payments had been made on a timely basis with no deterioration of NEXGEN's ability to perform. Though NEXGEN was performing as required by the contract and paying off existing and outstanding debts, including unpaid withholding taxes, MMG abused its rights under the note to pressure NEXGEN into accepting the new terms that it had proposed contrary to those agreed to in the commitment letter executed by the parties;

g. Refusing to disburse loan proceeds that were approved and for which conditions for disbursement had been met;

h. Forcing (and attempting to force) NEXGEN to assign certain revenues from the SBA contracts to benefit MMG's troubled investments in EZCertify;

i. Interfering with contracts and contract negotiations in which NEXGEN was a party;

j. Disclosing NEXGEN's confidential financial information to the SBA and eScout during 2002-2003 and EZCertify in June 2001 and June 2003;

k. Attempting to have NEXGEN's SBA contract awarded to a different minority business controlled by MMG, discussing NEXGEN and Howlette's financial conditions with the SBA, and making secret misrepresentations with respect thereto to the SBA between early 2002 (at the start of SBA contract modification negotiations) and December 2003 (when the contract

26

terminated);

l. Forcing NEXGEN to reduce its SBA contract prices by 40% in exchange for MMG's agreement to restructure existing debts and lend another $500,000 to finance NEXGEN's performance of the SBA contract. Then with no adverse material change having occurred, and after the SBA contract pricing had been modified, MMG refused to fund in accordance with the terms previously agreed to by the parties in writing, which triggered the defaults of other notes;

m. Drafting the first $500,000 note between CDV, the MMG Fund, and NEXGEN so that a default would exist on the day of execution.

n. Discouraging prospective lenders and executive team members from investing with or joining the NEXGEN executive team. For instance, in June 2003 and throughout that summer, MMG shared confidential information with William Woods, who was considering an executive position with and a substantial investment in NEXGEN, about NEXGEN's financial condition, their plans to sue NEXGEN, and their discomfort with Howlette as the CEO, all in an effort to create a figurehead controlled by them as well as to destroy NEXGEN's reputation and ability to retain executive personnel; and

o. CDV instructing Howlette not to use the first $500,000 loan proceeds to pay off the CDV bridge loan, even though it was due and CDV could call a default on the loan at any time, but to wait until the close of the next loan and restructuring once the SBA contract modification occurred.

91.    All of the above conduct was done by MMG, the MMG Fund, MSBDFA, CDV and the individual defendants as agents for these corporate defendants, in an effort to wrongfully further their own selfish financial interests, at the expense of NEXGEN.

92.    All of the above conduct was done with actual malice, evil motive, ill will, and intent to injure NEXGEN.

93.    As a direct and proximate result of the wrongful conduct, NEXGEN has been damaged financially, including, but not limited to, loss of contracting and other opportunities, the incurrence of extraordinary and unnecessary expenses, and cost of money and expenses while attempting to avoid the repercussions of all of the above actions.

WHEREFORE, NEXGEN and Howlette demand judgment against MMG, the MMG

27

Fund, MSBDFA, CDV, Tucker, Williams, Lockhart, and Smoot, in an amount no less than

$84,500,000.00, as compensatory damages, and in an amount no less than $253,500,000.00, as

punitive damages, and for such further relief, as the Court deems appropriate and just.

**COUNT II**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE**
**(EZCertify Agreement)**
**(Against MMG, MMG Fund, Tucker, Williams, Lockhart, and Smoot)**

94.     NEXGEN and Howlette hereby incorporate by reference the allegations made in

paragraphs 1 through 93 above, and reallege them as though fully set forth herein.

95.     MMG, by the individual defendants acting as agents of MMG and in their

individual capacities, directed Howlette to meet with then EZCertify CEO, Woody McCutchen,

to negotiate terms for a joint venture, and NEXGEN and EZCertify reached a verbal agreement

regarding the terms.

96.     When MMG discovered the terms and conditions of the joint venture, they

informed the parties that the terms agreed to by the parties were unacceptable and insisted that

their own attorney re-draft the terms and conditions for the joint venture.

97.     The terms that MMG dictated between NEXGEN and EZCertify were contrary to

the previous terms agreed to by the parties and to the detriment of NEXGEN and the benefit of

EZCertify and MMG.

98.     In the joint venture agreement that MMG drafted, MMG incorporated the MMG

Fund into the agreement as a third party beneficiary.

99.     MMG, on behalf of the MMG Fund, intentionally interfered with NEXGEN's

agreement with EZCertify by dictating terms and conditions between the parties, demanding a

28

significant reduction in compensation to be paid to NEXGEN, and requiring terms that benefited MMG and EZCertify but disadvantaged NEXGEN.

100.    As a result of MMG's intentional interference with the NEXGEN/EZCertify agreement, MMG tortiously interfered with the agreement and NEXGEN's prospective business advantage by negotiating and imposing conditions and terms into the agreement to the detriment of NEXGEN.

101.    As a result of MMG and the MMG Fund's intentional and wrongful conduct, NEXGEN has suffered monetary damages, including but not limited to the amount originally agreed to be paid for services and cost of money incurred by virtue of having to wait to be paid until revenue was generated by the project.

102.    MMG's actions were taken with actual malice, intent to injure, ill will, and evil motive – to advance its own self interests and those of their other portfolio company, the MMG Fund, at the expense and detriment of NEXGEN.

WHEREFORE, NEXGEN and Howlette demand judgment against MMG, MMG Fund, Tucker, Williams, Lockhart, and Smoot in an amount no less than $140,000.00, as compensatory damages, and in an amount no less than $420,000.00 as punitive damages, and for such further relief, as the Court deems appropriate and just.

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACT (SBA Contract)
### (Against MMG, CDV, MMG Fund, Tucker, Williams, Lockhart, and Smoot)

103.    NEXGEN and Howlette hereby incorporate by reference the allegations made in paragraphs 1 through 102 above, and reallege them as though fully set forth herein.

104.    NEXGEN had a contract with the SBA for NEXGEN to provide the SBA, other

29

small businesses, and government entities with NEXGEN's software program to facilitate and track federal agency procurements from small businesses.

105. As NEXGEN's lender for funds with which to perform on the contract, MMG knew that NEXGEN had a contract with the SBA.

106. As the equity Funds providing the loan funds with which NEXGEN was to perform on the SBA contract, CDV and the MMG Fund knew that NEXGEN had a contract with the SBA.

107. MMG and its affiliates, as well as the individual defendants who participated as agents of the corporate defendants named herein and in their individual capacities, intentionally interfered with NEXGEN's contract with the SBA by continuously undermining NEXGEN's efforts in its negotiations with the SBA for the contract modification by secretly disclosing confidential and proprietary information to the SBA, without NEXGEN's knowledge or approval, by insisting on attending meetings with the SBA against NEXGEN's wishes, by unilaterally contacting SBA officials and discussing matters relating to NEXGEN and its contract contrary to demands by both NEXGEN and the SBA contracting officer, by insisting that NEXGEN replace existing SBA-approved partners with other entities in which MMG had undisclosed interests, and by providing the SBA with false and personal information about NEXGEN's officers, which caused the SBA to lose faith in NEXGEN.

108. As a result of MMG and its affiliates' intentional interference with the NEXGEN/SBA contract, the SBA breached its agreement with NEXGEN.

109. As a result of MMG, CDV, the MMG Fund, and the individual defendants' intentional and wrongful conduct, NEXGEN has suffered monetary damages, including, but not

30

limited to, the amount originally agreed to be paid for services by the suppliers and the total profits expected under the terms of the SBA contract.

110.   The actions of MMG, CDV, and the MMG Fund were taken with actual malice, intent to injure, ill will, and evil motive.

111.   Due to MMG, CDV, and the MMG Fund's interference with NEXGEN's contract with the SBA, NEXGEN has been damaged.

WHEREFORE, NEXGEN and Howlette demand judgment against MMG, CDV, and MMG Fund, Tucker, Williams, Lockhart, and Smoot in an amount no less than $84,500,000.00, as compensatory damages, and in an amount no less than $253,500,000.00 as punitive damages, and such other relief as the Court deems appropriate and just.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE**
**(SBA Contract)**
**(Against MMG, CDV, MMG Fund, Tucker, Williams, Lockhart, and Smoot)**

112.   NEXGEN and Howlette hereby incorporate by reference the allegations made in paragraphs 1 through 111 above, and reallege them as though fully set forth herein.

113.   NEXGEN had a sole source contract with the SBA for NEXGEN to provide the SBA, other small businesses, and government entities with NEXGEN's software program to facilitate and track federal agency procurements from small businesses.

114.   As NEXGEN's lender for funds with which to perform on the contract, MMG and the individual defendants knew that NEXGEN had a sole source contract with the SBA.

115.   As the equity Funds providing the funds with which NEXGEN was to perform on the SBA contract, CDV and the MMG Fund knew that NEXGEN had a sole source contract with

31

the SBA.

116.    In obtaining this sole source contract with the SBA, NEXGEN had additional future opportunities with the SBA and other vendors.

117.    MMG, the individual defendants, and MMG's affiliates intentionally interfered with NEXGEN's contract with the SBA by continuously undermining NEXGEN's efforts in its negotiations with the SBA for the contract modification by secretly disclosing confidential and proprietary information to the SBA, without NEXGEN's knowledge or approval, by insisting on attending meetings with the SBA against NEXGEN's wishes, by unilaterally contacting SBA officials and discussing matters relating to NEXGEN and its contract contrary to demands by both NEXGEN and the SBA contracting officer, by insisting that NEXGEN replace existing SBA-approved partners with other entities in which MMG had undisclosed interests, and by providing the SBA with false information about NEXGEN's officers, which caused the SBA to lose faith in NEXGEN.

118.    As a result of MMG, the individual defendants, and MMG's affiliates' intentional interference with the NEXGEN/SBA contract and wrongful conduct, the SBA breached its agreement with NEXGEN, and NEXGEN lost the future opportunities it had with the SBA as the proprietor of this sole source perpetual contract and opportunities with other vendors.

WHEREFORE, NEXGEN and Howlette demand judgment against MMG, CDV, and MMG Fund, Tucker, Williams, Lockhart, and Smoot in an amount no less than $100,000,000.00, as compensatory damages, and in an amount no less than $300,000,000.00 as punitive damages, and such other relief as the Court deems appropriate and just.

**COUNT V**
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE
(SMART Technology and IBM Contracts)
(Against MMG, CDV, the MMG Fund, Tucker, Williams, Lockhart, and Smoot)

119.    NEXGEN and Howlette hereby incorporate by reference the allegations made in paragraphs 1 through 118 above, and reallege them as though fully set forth herein.

120.    NEXGEN and Howlette had a long-standing relationship with IBM.

121.    IBM provided NEXGEN with substantial amounts of free hardware, software, marketing, training, and consulting support as well as approximately $250,000 in financing in return for NEXGEN and Howlette's commitment to use IBM products in the development of the NEXGEN software to be used in the implementation of the SBA contract because of the high exposure and collateral account references that the product would generate as "the Largest production e-Commerce implementation in history, world-wide."

122.    In or about 2002, NEXGEN entered into an agreement with SMART Technology, Inc., whereby SMART Technology agreed, *inter alia,* to loan NEXGEN $125,000 and also agreed to hire and train support representatives in order for NEXGEN to service its contracts.

123.    SBA met with executives from NEXGEN and SMART Technology, and IBM reviewed the roles that each would be playing and approved of their participation in the SBA contract.

124.    Throughout the first six (6) months of 2003, MMG, CDV, the MMG Fund, and the individual defendants repeatedly demanded that NEXGEN breach the agreement with both SMART Technology and IBM in favor of their preferred sub-contractor eScout.

125.    In addition, MMG and Anthony Williams discouraged SMART Technology from

33

continuing its relationship with NEXGEN.  Before the SBA contract was terminated, Williams advised SMART Technology not to invest additional funds into NEXGEN.

126.    MMG's demand that NEXGEN replace the NEXGEN proprietary software built using IBM technology with technology created by eScout violated the long-standing and economic relationship agreement between IBM and NEXGEN and significantly damaged the relationship between the parties.

127.    MMG, CDV, the individual defendants, and the MMG Fund's tortious interference with NEXGEN's contract and economic relationship with SMART Technology and IBM were both wrongful and unjustified.

128.    Due to MMG's tortious interference with NEXGEN's contract with SMART, SMART Technology did not invest $300,000 of intended funds in NEXGEN, and NEXGEN's relationship with SMART Technology was destroyed.

129.    As a result of MMG, CDV, the individual defendants, and the MMG Fund's tortious interference with NEXGEN's economic relationship with SMART Technology and IBM, NEXGEN has suffered damages.

WHEREFORE, NEXGEN and Howlette demand judgment against MMG, CDV, the MMG Fund, Tucker, Williams, Lockhart, and Smoot in an amount no less than $8,000,000.00 as compensatory damages, and in an amount no less than $24,000,000.00 as punitive damages, and such other relief as the Court deems appropriate and just.

**COUNT VI**
**FRAUD**
**(Against MMG, CDV, the MMG Fund, Tucker, Williams, Lockhart, and Smoot)**

34

130.   NEXGEN and Howlette hereby incorporate by reference the allegations made in paragraphs 1 through 129 above, and reallege them as though fully set forth herein.

131.   MMG and the individual defendants, as agents of MMG and in their individual capacities, represented to NEXGEN and Howlette that they would invest and fund, through their portfolio of affiliated companies CDV and the MMG Fund, the development and performance of NEXGEN's contract with the SBA.

132.   MMG and the individual defendants, as agents of MMG and in their individual capacities, represented to NEXGEN and Howlette that while they were conducting due diligence, they would make a ninety (90) day bridge loan to NEXGEN in the amount of $75,000 that NEXGEN would re-pay with a larger loan of $500,000 from the MMG Fund, which would close in less than ninety (90) days.

133.   In reliance on the larger financing from MMG as the source of repayment for the ninety (90) day bridge loan from CDV, Howlette agreed to provide CDV with a lien on his primary residence as partial security for this short-term loan.

134.   MMG and the individual defendants, as agents of MMG and in their individual capacities, knew that the representations to NEXGEN and Howlette was false at the time that the representation was made.

135.   MMG never intended close the $500,000 loan from the MMG Fund within ninety (90) days even though it knew NEXGEN needed it to re-pay the CDV bridge loan in time.

136.   MMG then waited longer than ninety (90) days to close on the $500,000 loan from the MMG Fund, which created for MMG the opportunity to declare, or threaten to declare, NEXGEN and Howlette in default on the bridge loan from CDV at any time, for any reason, at

35

their sole discretion.

137.   Further, once MMG closed on the $500,000 loan from the MMG Fund, MMG would not allow NEXGEN to re-pay the $75,000 bridge loan to CDV with those funds so that MMG could retain control of NEXGEN and Howlette by being able to declare a default on the CDV bridge loan at any time knowing that if the $75,000 bridge loan was declared in default, this would trigger a default of the $500,000 loan from the MMG Fund and cause the forfeiture of Howlette's residence.

138.   MMG and the individual defendants, as agents of MMG and in their individual capacities, intended for NEXGEN and Howlette to rely on their false and fraudulent representations.

139.   NEXGEN and Howlette did rely on MMG's representations that it would make a larger loan of $500,000 before the ninety (90) days elapsed so that NEXGEN could re-pay the bridge loan from CDV.

140.   Because of the control that MMG consistently held NEXGEN and Howlette under, NEXGEN and Howlette had no recourse as to any other lender.

141.   As a result of the false and fraudulent representations made by MMG, CDV, the individual defendants, as agents of MMG and in their individual capacities, and the MMG Fund and the position of control that MMG attempted to acquire over NEXGEN, the SBA canceled its contract with NEXGEN.

WHEREFORE, NEXGEN and Howlette demand judgment against MMG, CDV, and MMG Fund, Tucker, Williams, Lockhart, and Smoot in an amount no less than $84,500,000.00, as compensatory damages, and in an amount no less than $253,500,000.00 as punitive damages,

and such other relief as the Court deems appropriate and just.

## COUNT VII
## NEGLIGENT MISREPRESENTATION
### (Against MMG, CDV, the MMG Fund, Tucker, Williams, Lockhart, and Smoot)

142.    NEXGEN and Howlette hereby incorporate by reference the allegations made in paragraphs 1 through 141 above, and reallege them as though fully set forth herein.

143.    MMG and the individual defendants, as agents of MMG and in their individual capacities, represented to NEXGEN and Howlette that they would invest and fund, through their portfolio companies CDV and the MMG Fund, the development of NEXGEN's contract with the SBA and the performance of the contract.

144.    MMG and the individual defendants, as agents of MMG and in their individual capacities, represented to NEXGEN and Howlette that while they were conducting due diligence, they would make a ninety (90) day bridge loan to NEXGEN in the amount of $75,000 that NEXGEN would re-pay with a larger loan of $500,000 from the MMG Fund, which would close in less than ninety (90) days.

145.    In reliance on the larger financing from MMG as the source of repayment for the ninety (90) day bridge loan from CDV, Howlette agreed to provide CDV with a lien on his primary residence as partial security for this short-term loan.

146.    MMG's representation to NEXGEN and Howlette was negligent when made.

147.    MMG then waited longer than ninety (90) days to close on the $500,000 loan from the MMG Fund, which created for MMG the opportunity to declare NEXGEN and Howlette in default on the bridge loan from CDV.

37

148.     Further, once MMG closed on the $500,000 loan from the MMG Fund, MMG would not allow NEXGEN to re-pay the $75,000 bridge loan to CDV with those funds so that MMG could retain control of NEXGEN and Howlette by being able to declare a default on the CDV bridge loan at any time knowing that if the $75,000 bridge loan was declared in default, this would trigger a default of the $500,000 loan from the MMG Fund and cause the forfeiture of Howlette's residence.

149.     NEXGEN and Howlette relied on MMG's negligent representations that it would make a larger loan of $500,000 before the ninety (90) days elapsed so that NEXGEN could re-pay the bridge loan from CDV.

150.     Because of the control that MMG consistently held NEXGEN and Howlette under, NEXGEN and Howlette had no recourse as to any other lender.

151.     As a result of the false representations made by MMG, CDV, the individual defendants, as agents of MMG and in their individual capacities, and the MMG Fund and the position of control that MMG attempted to acquire over NEXGEN, the SBA canceled its contract with NEXGEN.

WHEREFORE, NEXGEN and Howlette demand judgment against MMG, CDV, and MMG Fund, Tucker, Williams, Lockhart, and Smoot in an amount no less than $84,500,000.00, as compensatory damages, and in an amount no less than $253,500,000.00 as punitive damages, and such other relief as the Court deems appropriate and just.

**COUNT VIII**
**INTENTIONAL MISREPRESENTATION**
**(Against MMG, CDV, the MMG Fund, Tucker, Williams, Lockhart, and Smoot)**

38

152.   NEXGEN and Howlette hereby incorporate by reference the allegations made in paragraphs 1 through 151 above, and reallege them as though fully set forth herein.

153.   MMG and the individual defendants, as agents of MMG and in their individual capacities, represented to NEXGEN and Howlette that they would invest and fund, through their portfolio of affiliated companies CDV and the MMG Fund, the development of NEXGEN's contract with the SBA and the performance of the contract.

154.   MMG and the individual defendants, as agents of MMG and in their individual capacities, represented to NEXGEN and Howlette that while they were conducting due diligence, they would make a ninety (90) day bridge loan to NEXGEN in the amount of $75,000 that NEXGEN would re-pay with a larger loan of $500,000 from the MMG Fund, which would close in less than ninety (90) days.

155.   In reliance on the larger financing from MMG as the source of repayment for the ninety (90) day bridge loan from CDV, Howlette agreed to provide CDV with a lien on his primary residence as partial security for this short-term loan.

156.   MMG knew that its representation to NEXGEN and Howlette was false at the time that the representation was made.

157.   MMG knew that it never intended close the $500,000 loan from the MMG Fund within ninety (90) days even though it knew NEXGEN needed it to re-pay the CDV bridge loan in time.

158.   MMG then waited longer than ninety (90) days to close on the $500,000 loan from the MMG Fund, which created for MMG the opportunity to declare NEXGEN and Howlette in default on the bridge loan from CDV.

159.   Further, once MMG closed on the $500,000 loan from the MMG Fund, MMG would not allow NEXGEN to re-pay the $75,000 bridge loan to CDV with those funds so that MMG could retain control of NEXGEN and Howlette by being able to declare a default on the CDV bridge loan at any time knowing that if the $75,000 bridge loan was declared in default, this would trigger a default of the $500,000 loan from the MMG Fund and cause the forfeiture of Howlette's residence.

160.   MMG intended for NEXGEN and Howlette to rely on its false representations.

161.   NEXGEN and Howlette did rely on MMG's representations that it would make a larger loan of $500,000 before the ninety (90) days elapsed so that NEXGEN could re-pay the bridge loan from CDV.

162.   Because of the control that MMG consistently held NEXGEN and Howlette under, NEXGEN and Howlette had no recourse as to any other lender.

163.   As a result of the false representations made by MMG, CDV, the individual defendants, as agents of MMG and in their individual capacities, and the MMG Fund and the position of control that MMG attempted to acquire over NEXGEN, the SBA canceled its contract with NEXGEN.

WHEREFORE, NEXGEN and Howlette demand judgment against MMG, CDV, and MMG Fund, Tucker, Williams, Lockhart, and Smoot in an amount no less than $84,500,000.00, as compensatory damages, and in an amount no less than $253,500,000.00 as punitive damages, and such other relief as the Court deems appropriate and just.

40

## COUNT IX
## FRAUD
### (Against MMG, CDV, the MMG Fund, Tucker, Williams, Lockhart, and Smoot)

164.    NEXGEN and Howlette hereby incorporate by reference the allegations made in paragraphs 1 through 163 above, and reallege them as though fully set forth herein.

165.    MMG and one or more of the individual defendants, as agents of MMG and in their individual capacities, drafted a term sheet for a second loan of $500,000 to NEXGEN to be provided by the MMG Fund and CDV.

166.    MMG and Anthony Williams knew that they did not intend to extend the second loan for $500,000 on the terms and conditions set forth in the written commitment letter.

167.    MMG and the individual defendants, as agents of MMG and in their individual capacities, knowingly misrepresented its ability and/or willingness to provide the requisite loan funds to NEXGEN if NEXGEN lowered its contract prices to the SBA.

168.    NEXGEN relied on MMG's written commitment to lend and restructure the second $500,000 loan from the MMG Fund as a prerequisite to lowering its contract prices to the SBA, as demanded by MMG.

169.    Once NEXGEN did in fact lower its SBA contract prices, and executed a contract modification based on these lowered prices, MMG refused to disburse funds under the stated conditions, as promised, and NEXGEN could not perform sufficiently under the SBA contract.

170.    As a direct and proximate result of the fraudulent representations and failure to fund as promised, NEXGEN suffered monetary damages, including, but not limited to, loss of the SBA contract, loss of income and business opportunities, unnecessary litigation and other expenses, and damages associated with cost of money borrowed that would not have been

41

incurred if MMG, the MMG Fund, and CDV had not failed to honor their agreements with NEXGEN.

WHEREFORE, NEXGEN and Howlette demand judgment against MMG, CDV, MMG Fund, Tucker, Williams, Lockhart, and Smoot in an amount no less than $84,500,000 as compensatory damages, and in an amount no less than $253,500,000 as punitive damages, and such other relief as the Court deems appropriate and just.

## COUNT X
## INTENTIONAL MISREPRESENTATION
### (Against MMG, CDV, the MMG Fund, Tucker, Williams, Lockhart, and Smoot)

171.   NEXGEN and Howlette hereby incorporate by reference the allegations made in paragraphs 1 through 170 above, and reallege them as though fully set forth herein.

172.   MMG and the individual defendants, as agents of MMG and in their individual capacities, drafted a term sheet for a second loan of $500,000 to NEXGEN to be provided by the MMG Fund and CDV.

173.   The defendants knew that they did not intend to extend the second loan for $500,000 on the terms and conditions set forth in the written commitment letter.

174.   MMG knowingly and intentionally misrepresented its ability and/or willingness to provide the requisite loan funds to NEXGEN if NEXGEN lowered its contract prices to the SBA.

175.   NEXGEN justifiably relied on MMG's written commitment to lend and restructure the second $500,000 loan from the MMG Fund as a prerequisite to lowering its contract prices to the SBA, as demanded by MMG.

176.   Once NEXGEN did in fact lower its SBA contract prices, and executed a contract modification based on these lowered prices, MMG refused to disburse funds under the stated

42

conditions, as promised, and NEXGEN could not perform sufficiently under the SBA contract.

177.   As a direct and proximate result of the fraudulent representations and failure to fund as promised, NEXGEN suffered monetary damages, including, but not limited to, loss of the SBA contract, loss of income and business opportunities, unnecessary litigation and other expenses, and damages associated with cost of money borrowed that would not have been incurred if MMG, the MMG Fund, and CDV had not failed to honor their agreements with NEXGEN.

WHEREFORE, NEXGEN and Howlette demand judgment against MMG, CDV, MMG Fund, Tucker, Williams, Lockhart, and Smoot in an amount no less than $84,500,000 as compensatory damages, and in an amount no than $253,500,000 as punitive damages, and such other relief as the Court deems appropriate and just.

## COUNT XI
## NEGLIGENT MISREPRESENTATION
### (Against MMG, CDV, the MMG Fund, Tucker, Williams, Lockhart, and Smoot)

178.   NEXGEN and Howlette hereby incorporate by reference the allegations made in paragraphs 1 through 177 above, and reallege them as though fully set forth herein.

179.   MMG and the individual defendants, as agents of MMG and in their individual capacities, drafted a term sheet for a second loan of $500,000 to NEXGEN to be provided by the MMG Fund and CDV.

180.   The defendants knew that they did not intend to extend the second loan for $500,000 on the terms and conditions set forth in the written commitment letter.

181.   MMG's representation of its ability and/or willingness to provide the requisite loan funds to NEXGEN if NEXGEN lowered its contract prices to the SBA was false when

made.

182.    MMG's representation of its willingness to provide an additional $500,000 loan to NEXGEN if NEXGEN lowered its SBA contract prices was made without any reasonable ground of believing it to be true.

183.    The representation by MMG was made with the intent that NEXGEN rely upon it.

184.    NEXGEN was unaware of the falsity of the representations made by MMG, CDV, and the MMG Fund, and justifiably relied on MMG's commitment to lend and restructure the second $500,000 loan from the MMG Fund as a prerequisite to lowering its contract prices to the SBA, as demanded by MMG.

185.    Once NEXGEN did in fact lower its SBA contract prices and executed a contract modification based on these lowered prices, MMG refused to disburse funds under the stated conditions, as promised, and NEXGEN could not perform sufficiently under the SBA contract.

186.    As a direct and proximate result of the fraudulent representations and failure to fund as promised, NEXGEN suffered monetary damages, including, but not limited to, loss of the SBA contract, loss of income and business opportunities, unnecessary litigation and other expenses, and damages associated with cost of money borrowed that would not have been incurred if MMG, the MMG Fund, and CDV had not failed to honor their agreements with NEXGEN.

WHEREFORE, NEXGEN and Howlette demand judgment against MMG, CDV, MMG Fund, Tucker, Williams, Lockhart, and Smoot in an amount no less than $84,500,000 as compensatory damages, and in an amount no less than $253,500,000 as punitive damages, and such other relief as the Court deems appropriate and just.

44

## COUNT XII
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against MMG, CDV, MMG Fund, MSBDFA, MAG,
### Tucker, Williams, Lockhart, and Smoot)

187.    NEXGEN and Howlette hereby incorporate by reference the allegations made in

paragraphs 1 through 186 above, and reallege them as though fully set forth herein.

188.    As a lender, MMG had the implied obligation to deal fairly with NEXGEN in

good faith.

189.    The MMG Fund, MSBDFA, MAG, CDV, and the individual defendants, in their

individual capacities and as agents of MMG, had implied obligations to fairly deal with

NEXGEN in good faith.

190.    MMG, MMG Fund, MSBDFA, MAG, CDV, and the individual defendants, in

their individual capacities and as agents of MMG, breached those implied obligations to

NEXGEN.  The breaches include:

a. MMG intentionally structured the first financing of $500,000 so that a default would exist immediately upon its execution by the parties.

b. CDV declared that the bridge loan was in default immediately following NEXGEN's rejection of MMG's attempt to substantially change the terms that the parties had agreed to in writing, considering CDV's prior pattern of making no attempt to collect or declare a default for the previous twelve (12) months.

c. MMG and CDV agreed to extend the payment date on the $75,000 bridge loan from CDV until closing of the second larger financing of $500,000.  However, in October 2002, MMG determined to decrease the proposed funding, after having signed a commitment letter clearly outlining the terms of the deal as a condition to NEXGEN, reducing its SBA contract prices at the demand of MMG, and with no material adverse change having occurred was unreasonable, arbitrary, and capricious.

d. MMG and the MMG Fund failed to disburse all of the funds authorized under the initial $500,000 note despite their "stated" interest in closing a second round of financing for

45

$500,000.

e.  MSBDFA, and MMG acting as its agent, refused to disburse the remaining $250,000 pursuant to the terms of the agreement between the parties without good cause.

f.  MMG threatened to put NEXGEN into involuntary bankruptcy unless NEXGEN agreed to new terms for the second $500,000 financing that were not contemplated by the written commitment drafted by MMG, knowing said terms could cause NEXGEN to be disqualified from participation in the SBA 8(a) program and understanding that this could result in termination of the SBA contract.

g.  On August 5, 2002, the MMG Fund provided a $75,000 Revolving Line of Credit. Then, in October 2002, MMG, without notice or good cause, arbitrarily and without reason, began declining NEXGEN's requests for disbursement under the Agreement and closed the line of credit.

h.  MMG arbitrarily refused to provide funds that were obligated and available for disbursement consistent with the terms of the credit facility agreement between the parties, then informed the SBA that NEXGEN was unable to perform due to lack of financial resources.

i.  MMG demanded that NEXGEN disburse funds to benefit its troubled investment in EZCertify, in exchange for releasing any further funds from the original $500,000 loan from the MMG Fund and in exchange for MMG to restructure and invest a second $500,000 into NEXGEN.

j.  MMG represented to SBA that they were attempting to have Howlette replaced, after Howlette, on his own initiative, recruited and secured a qualified executive to accept a position with NEXGEN as President.

k.  MMG scheduled the sale of Howlette's stock while contemporaneously leveraging the secured lien positions of the MMG Fund, CDV, and MSBDFA to prevent Howlette from liquidating assets necessary to repay the debts, which was a condition precedent to MMG's rights to sell the stock.

l.  MMG assured NEXGEN that the funds it required NEXGEN to disburse to EZCertify would be credited back against NEXGEN's outstanding loan balance but had no intention of doing so.

m.  MMG demanded, as a condition for further funding, that NEXGEN reduce its SBA contract prices to gain favor with the SBA, to NEXGEN's financial detriment, and to increase NEXGEN's financial reliance on MMG.

46

n. MMG, the MMG Fund, and CDV attempted to force NEXGEN to establish a sub-contracting relationship with eScout, which would require NEXGEN to violate federal procurement regulations, by threatening to inform the SBA that NEXGEN owed outstanding payroll withholding taxes unless NEXGEN agreed to such a relationship.

o. In or about 2002 and 2003, MMG and CDV made false and misleading representations to NEXGEN's customers and vendors to ensure NEXGEN's financial reliance on MMG.

p. MMG accelerated the first $500,000 note even though payments had been made on a timely basis with no deterioration of NEXGEN's ability to perform and prior to having declared a default on the $75,000 bridge loan. Though NEXGEN was performing as required by the contract and paying off existing and outstanding debts (including unpaid withholding taxes), MMG was using its rights under the note to pressure NEXGEN into accepting the new terms for a second loan of $500,000, which it had proposed and that were contrary to those agreed to in the commitment letter executed by the parties.

q. MMG conditioned additional loans to NEXGEN on NEXGEN's agreement to reduce its SBA contract prices by 40% in exchange for MMG's agreement to pay off and/or restructure existing debts and lend another $500,000 to finance NEXGEN's performance of the SBA contract. Then, with no adverse material change having occurred, and after the SBA contract pricing had been modified, MMG refused to fund in accordance with the terms previously agreed to by the parties in writing, which triggered the defaults of other notes.

r. MMG instructed MAG, an entity it controlled, to evaluate NEXGEN's financial requirements only going forward so that NEXGEN would be unable to repay past loans, and MAG complied.

191.    MMG, the MMG Fund, MSBDFA, and CDV, as lenders to NEXGEN, lacked a

legitimate objective for cutting off funding to NEXGEN and failed to give adequate notice to

NEXGEN of their decisions to do so, interfered with NEXGEN's ability to secure alternative

investment sources, and prevented NEXGEN and Howlette from securing funds to satisfy their

debts.

WHEREFORE, NEXGEN and Howlette demand judgment against MMG, the MMG

Fund, MSBDFA, CDV, MAG, Tucker, Williams, Lockhart, and Smoot in an amount no less than

$84,500,000.00 as compensatory damages, and in an amount no less than $253,500,000.00 as

47

punitive damages, and such other relief as the Court deems appropriate and just.

## COUNT XIII
### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING - CONTROL
(Against MMG, CDV, MMG Fund, Tucker, Williams, Lockhart, and Smoot)

192.    NEXGEN and Howlette hereby incorporate by reference the allegations made in paragraphs 1 through 191 above, and reallege them as though fully set forth herein.

193.    MMG and the individual defendants, in their individual capacities and as agents of MMG, knew that NEXGEN would be using the loaned funds, in part, to pay salaries or wages as well as federal and state withholding tax obligations.

194.    MMG, CDV, the MMG Fund, and the individual defendants knew that NEXGEN had outstanding payroll obligations prior to the closing of the bridge note, the initial financing, and the line of credit, and it was the intention of the parties that this would be addressed with the closing of the second financing.

195.    In fact, Howlette was told that Smoot would address NEXGEN's tax liabilities with the IRS on behalf of NEXGEN.

196.    MMG and the MMG Fund refused to allow NEXGEN to pay its payroll tax obligations to the IRS, despite several communications from Howlette that the matters needed to be addressed and jeopardized ongoing operations, and wrongfully withheld payments for NEXGEN's tax obligations from NEXGEN's loan advances.

197.    MMG, CDV, the MMG Fund, and the individual defendants, in their individual capacities and as agents of MMG, improperly controlled the day-to-day operations of NEXGEN as follows:

a. MMG and CDV negotiated contract terms and conditions with NEXGEN customers, at

48

their sole discretion;

     b. MMG and CDV met with potential vendors, subcontractors, and customers to discuss and make decisions regarding the business affairs of NEXGEN, at their sole discretion;

     c. MMG decided which employees, creditors, and vendors would be paid;

     d. MMG utilized NEXGEN facilities and resources for their own purposes (and that of their other portfolio companies) and at their discretion;

     e. MMG called for specific employees to be fired based on their own assessment of the employees' contribution to the SBA contract, current priorities, and the running of operations;

     f. MMG arranged and attended NEXGEN customer meetings without notifying NEXGEN of such meetings;

     g. MMG required that NEXGEN breach agreements with existing, long-standing, business partners who had invested in NEXGEN's performance of the SBA contract;

     h. MMG directed sources of revenue pursued by NEXGEN to their vendor EZCertify (in which MMG had a substantial investment) and required NEXGEN to enter into an agreement with EZCertify to the benefit of EZCertify and MMG.

     i. MMG and the MMG Fund re-negotiated and imposed terms on NEXGEN's agreement with EZCertify, in which it had invested.

     j. MMG indicated that Smoot would address NEXGEN's tax liabilities with the IRS on behalf of NEXGEN.

     k. MMG made payments to vendors and employees instead of loaning additional funds to NEXGEN to make needed payments.

     198.    In many of these situations, MMG either secured NEXGEN's compliance by threatening NEXGEN and Howlette with retraction of promised loan funds and declaring a default on the CDV loan (which it would not allow NEXGEN to repay), or acting without NEXGEN consent.

     WHEREFORE, NEXGEN and Howlette demand judgment against MMG, CDV, MMG Fund, Tucker, Williams, Lockhart, and Smoot in an amount no less than $84,500,000.00 as

compensatory damages, and in an amount no less than $253,500,000.00, as punitive damages, and such other relief as the Court deems appropriate and just.

## COUNT XIV
## CIVIL CONSPIRACY
### (Against MMG, CDV, MSBDFA, MMG Fund, MAG, Tucker, Williams, Lockhart, and Smoot)

199.   NEXGEN and Howlette hereby incorporate by reference the allegations made in paragraphs 1 through 198 above, and reallege them as though fully set forth herein.

200.   The defendants, including the individual defendants in both their individual capacities and acting as agents for MMG, entered into an agreement to wrongfully acquire NEXGEN and/or its technologies and knowledge to wrongfully benefit themselves and their affiliates and investments.

201.   MMG and CDV agreed that CDV would not declare NEXGEN in default of the $75,000 bridge loan or seek repayment of the loan until closing of the second financing in furtherance of the conspiracy.

202.   In furtherance of the conspiracy, MMG and the MMG Fund agreed to demand that $40,000 of the funding that they had agreed to provide to NEXGEN be passed through NEXGEN to EZCertify, a company in which MMG had invested and in which MMG shared officers, as a prerequisite for closing the first $500,000 the loan to NEXGEN. This was part of a larger requirement imposed by the MMG Fund that called for NEXGEN to enter into a joint venture with EZCertify and provide that company with financing, labor, and support necessary to develop an internet-based software program, for the benefit of MMG and EZCertify and at the expense of NEXGEN.

50

203.    In furtherance of the conspiracy, MMG instructed MAG, an entity it controlled, to evaluate NEXGEN's financial requirements only going forward so that NEXGEN would be unable to repay past loans, and MAG complied.

204.    In furtherance of the conspiracy, MMG, the MMG Fund, and CDV intentionally structured the first financing of $500,000 so that the declaration of a default would exist on the CDV note, which would automatically trigger a default on the $500,000 note.   When NEXGEN objected to these arrangements, MMG and CDV instructed NEXGEN and Howlette not to be concerned because they would not declare the default.  They then threatened to cancel the loans and foreclose on the CDV bridge loan that they knew could not be repaid absent the $500,000 loan from the MMG Fund.

205.    In furtherance of the conspiracy, MMG and MSBDFA intentionally structured the very first financing of $500,000 from the MMG Fund, the timing, and amount so that a default would exist immediately upon its execution by the parties, providing them with the leverage and opportunity to declare a default on the loan at any time, for any reason, and at the sole discretion of MMG and the MMG Fund.

206.    In furtherance of the conspiracy, MMG and MSBDFA prevented NEXGEN from repaying the $75,000 bridge loan from CDV by refusing to release the second $250,000 that NEXGEN was entitled to receive once certain conditions were met (and when they were met) under NEXGEN's agreement with MSBDFA.

207.    In furtherance of the conspiracy, MMG and CDV breached the Stock Pledge Agreement by claiming they had executed certain rights under the agreement that were specifically reserved for Howlette as a condition precedent to them exercising their rights to sell

51

the stock that had been pledged by Howlette as collateral.

208.   In furtherance of the conspiracy, MMG and CDV colluded with a NEXGEN

competitor to provide the competitor with control of the SBA contract and them control of

NEXGEN.

209.   In furtherance of the conspiracy, in an effort to gain favor with their regulator,

MMG and CDV coerced NEXGEN to give the SBA better contract pricing on a contract that had

already been awarded.

210.   In furtherance of the conspiracy, MMG and CDV made false and misleading

representations about NEXGEN and Howlette that had been made to the White House and

Congress in an effort to get the SBA to cancel its contract with NEXGEN.

211.   In furtherance of the conspiracy, MMG and CDV coerced NEXGEN to negotiate

the SBA contract modification for the benefit of SBA in an effort to gain favor with the regulator

of their SBIC.

WHEREFORE, NEXGEN and Howlette demand judgment against MMG, CDV, the

MMG Fund, MSBDFA, MAG, Tucker, Williams, Lockhart, and Smoot in an amount no less

than $84,500,000.00 as compensatory damages, and in an amount no less than $253,500,000.00

as punitive damages, and such other relief as the Court deems appropriate and just.

## COUNT XV
## BREACH OF CONTRACT
### (Addition of Material terms not called for in term sheet)
### (Against MMG, CDV, and MMG Fund)

212.   NEXGEN and Howlette hereby incorporate by reference the allegations made in

paragraphs 1 through 211 above, and reallege them as though fully set forth herein.

52

213.    MMG and NEXGEN had a commitment for MMG to provide a restructuring of the existing debts owed by NEXGEN to the MMG Fund for the first $500,000 loan.  CDV's bridge note was to be repaid within ninety (90) days upon closing of the first $500,000 loan.

214.    After the ninety (90) days had elapsed, MMG provided NEXGEN with the documentation for the first $500,000 loan, which stated that if any default existed on any MMG-based loan, MMG could declare the first $500,000 loan in default.

215.    The closing documentation for the initial $500,000 investment was inconsistent with the term sheet executed by the parties.  NEXGEN was forced to agree to these new terms because MMG threatened to renege on its additional funding to NEXGEN, declare a default on the CDV bridge loan, and foreclose on Howlette's residence if NEXGEN refused to agree.

216.    Once this loan closed, MMG conditioned disbursement of the $500,000 on NEXGEN's compliance with MMG's increasing demands about how and upon what the proceeds should be spent.

217.    These material changes to the term sheet for the first $500,000 loan included:

a. demanding a seat on the board of directors, while the letter of intent just gave MMG observation rights, but no actual board seat;

b. the right to invoke a "put" provision after two years, while the letter of intent stated that the "put" provision could not be invoked until after four years;

c. calling for two separate warrants worth 20% and 19.79%, respectively, of NEXGEN's authorized shares, while the letter of intent just calls for detached warrants for 20% of NEXGEN's fully diluted equity; and

d. modification of the terms and conditions of the joint venture agreement between NEXGEN and EZCertify to the benefit of MMG (as a payee) and their portfolio company EZCertify, and to NEXGEN's detriment.

e. refusing to credit the funds advanced to ezCertify, at the direction of MMG, against

the outstanding principal loaned to NEXGEN as agreed to by the parties and reflected in paragraph 8.1 of the Joint Venture Agreement;

218.   When NEXGEN baulked at these conditions, MMG threatened to kill the financing and declare the $75,000 CDV bridge loan in default.

219.   When MMG issued the second term sheet for the second $500,000 loan as the condition precedent to NEXGEN's agreement to lower its SBA contract prices (though such reductions were not requested by the SBA), MMG conditioned advancement of these loan proceeds for the second $500,000 (to come from CDV and the MMG Fund) on SBA's issuance of a contract modification.

220.   Then, after NEXGEN lowered its contract prices, in reliance on the MMG commitment as its source of funding for its continued performance, and after the SBA locked the new contract prices in by issuing the sought after contract modification and instructed NEXGEN to move forward with performance, MMG wrongfully refused to close the second financing for $500,000.

221.   The closing documentation for the second $500,000 loan contained terms that were contrary to those stated in the term sheet.

222.   MMG refused to close their proposed second $500,000 financing or restructure their existing debts as previously agreed when NEXGEN refused to accept materially adverse last minute changes to the proposed terms of financing, which substantially increased the cost of the transaction and required advanced SBA approval to avoid violation of regulations governing the award of its contract.  Despite NEXGEN's request, and the clear violation of SBA 8(a) program regulations, MMG refused to seek advanced approval of the terms from SBA as

54

required for NEXGEN's continued participation in the 8(a) program.

223.    As to the closing of the second $500,000 loan, materially adverse changes in the terms included changing the consideration to be paid for 80% of NEXGEN's stock from approximately $3.5 Million to $1.00 while MMG had committed to restructuring the existing $500,000 financing and investing an additional $500,000 on the same terms as the first loan (pro rata) knowing that the commitment was a condition precedent to NEXGEN lowering its SBA contract prices.

224.    MMG refused to restructure the original $500,000 financing, refused to pay off (or restructure) the $75,000 CDV bridge note with the larger loans, refused to disburse the remaining $250,000 that NEXGEN was entitled to receive pursuant to the terms of the MSBDFA financing, and threatened to terminate (and eventually did terminate without notice or justification) the $75,000 revolving line of credit **unless** NEXGEN agreed to the modified terms for the second financing and an illegal sub-contracting arrangement with MMG's favored large business, eScout.

225.    These conditions were materially adverse modifications of the first and second investments by MMG and clearly not included in the initial proposals made by MMG and accepted by NEXGEN.

226.    As a result of MMG's addition of materially adverse terms and conditions to the agreements, particularly changes to the terms and conditions governing the conversion of the warrant to stock, substantial changes to the structure and exercise price for the warrants, and the forced reduction of costs to the SBA, NEXGEN did not secure the funding from MMG necessary to perform its ongoing obligations under the SBA contract, did not have time to secure an

55

alternative lending source, and generated, at minimum, $500,000 less than it otherwise would have generated from the participation of small businesses in the SBA Exchange program.

WHEREFORE, NEXGEN and Howlette demand judgment against MMG, CDV, and MMG Fund in an amount no less than $84,500,000.00 as compensatory damages, and the amount of $253,500,000.00 as punitive damages, and such other relief as the Court deems appropriate and just.

## COUNT XVI
## BREACH OF CONTRACT (Promise to Forebear)
### (Against MMG, MMG Fund, CDV)

227.    NEXGEN and Howlette hereby incorporate by reference the allegations made in paragraphs 1 through 226 above, and reallege them as though fully set forth herein.

228.    On or about July 5, 2001, MMG arranged for CDV to provide a ninety (90) day bridge loan of $75,000 to NEXGEN to cover its operating expenses while NEXGEN and MMG finalized paperwork for a larger financing to be provided jointly by CDV and the MMG Fund.

229.    At that time, MMG informed NEXGEN that the bridge loan would be re-paid from the proceeds of the initial (and ultimately) $500,000 financing from the MMG Fund to be closed within ninety (90) days of executing the bridge loan.

230.    Based on its own due diligence, MMG was aware that NEXGEN had no source of repaying the bridge loan in the absence of closing the larger financing transaction contemplated by the parties.

231.    In reliance on the larger financing scheduled by the parties to close in less than ninety (90) days, Howlette agreed to provide CDV with a lien on his primary residence as partial security for the ninety (90) day bridge loan.

56

232.   MMG agreed to allow repayment of the $75,000 CDV bridge loan from the proceeds of the first $500,000 loan from the MMG Fund, which closing was intentionally held up by MMG until approximately 92 days had passed for the purpose of "acquiring" the ability to declare a default in the initial ninety (90) day repayment period, which was then continuously used by MMG to coerce unlawful concessions from NEXGEN, to the substantial detriment of NEXGEN and benefit of MMG, CDV, and the MMG Fund, and, ultimately, to acquire sole control of NEXGEN, its valuable proprietary software, and the benefits of its SBA contract.

233.   Just prior to closing, MMG refused to allow NEXGEN to use the proceeds to pay off the CDV debt as had been agreed by the parties when the $75,000 bridge loan was executed. MMG and CDV informed NEXGEN that they would not allow NEXGEN to use proceeds from the then soon to close second $500,000 financing from the MMG Fund.  When Howlette disagreed because the bridge loan was technically in default, MMG, the MMG Fund, and CDV promised that they would not declare a default and would forebear against collection of the $75,000 CDV bridge loan until the closing of the second $500,000 financing and restructuring of existing NEXGEN debts.

234.   In breach of its agreement and commitments to forebear, MMG leveraged the ability to declare a default under the $75,000 CDV bridge note so as to try to force Howlette to agree to last minute materially adverse changes to the terms of the second $500,000 financing and restructuring.  MMG knew that NEXGEN lacked the means to repay the CDV bridge loan in the absence of their funding before closing the transaction for $75,000, which was only intended to cover operational costs until NEXGEN received the second investment (of the first $500,000) from MMG and the MMG Fund.

57

235.    When Howlette refused to accept the MMG, the MMG Fund, and CDV's unilaterally and materially adverse last minute modified terms for the second financing, the MMG Fund and CDV filed lawsuits against NEXGEN.

236.    MMG continually interfered with NEXGEN's repayment to CDV and then breached its own promise to forebear from the exercise of remedies otherwise available to it.

237.    As a result of the actions herein, NEXGEN suffered damages.

WHEREFORE, NEXGEN and Howlette demand judgment against MMG, CDV, and the MMG Fund in an amount no less than $575,000.00 as compensatory damages, and and such other relief as the Court deems appropriate and just.

## COUNT XVII
## BREACH OF CONTRACT
### (Sale of Howlette Stock in violation of Stock Pledge Agreement)
### (Against MMG and MMG Fund)

238.    NEXGEN and Howlette hereby incorporate by reference the allegations made in paragraphs 1 through 237 above, and reallege them as though fully set forth herein.

239.    On October 4, 2001, MMG and Howlette executed a Stock Pledge Agreement for $500,000 in financing.

240.    The Agreement allowed for certain conditions under which MMG would be authorized to sell Howlette's stock in NEXGEN.

241.    Those conditions, as stated in the Agreement, are as follows:  that in the event of a default on the indebtedness *and* when "the Pledgor shall have exhausted reasonable efforts without success to obtain payment from any other party liable therefore and from the liquidation of any other collateral, the Pledgee may upon seven days notice to the Pledgor sent by registered

58

mail to the following address . . . and without liability for any diminution in price which may have occurred, sell all or part of the pledged stock at private sale or public auction in such manner and for such price as the Pledgee may determine, free from any right or equity or redemption. At any public sale, the Pledgee may purchase all or any part of the pledged stock . "

242.    The conditions precedent to MMG having the right to sell the stock were never satisfied.

243.    MMG would not consent to Howlette taking the actions necessary to avoid sale of the stock and prevented Howlette from liquidating any collateral so that MMG could acquire equity control of NEXGEN.  Specifically, among other things, MMG and the MMG Fund would not allow Howlette to sell the assets of Nexgen.Commerce, Inc., as provided by the Agreement, which would halt the sale of the stock

244.    On June 2, 2003, MMG served notice upon NEXGEN that its stock was being scheduled for sale at 10 a.m. on June 13, 2003.

245.    When MMG notified NEXGEN about the sale of Howlette's stock, Howlette had no alternative but to file for bankruptcy protection.

246.    As a result of MMG's violation of the Agreement, NEXGEN incurred damages.

WHEREFORE, NEXGEN and Howlette demand judgment against MMG and the MMG Fund in an amount no less than $1,500,000.00 as compensatory damages, and such other relief as the Court deems appropriate and just.

## COUNT XVIII
## BREACH OF CONTRACT (Confidentiality Agreement)
### (Against MMG and the MMG Fund)

247.    NEXGEN and Howlette hereby incorporate by reference the allegations made in

59

paragraphs 1 through 246 above, and reallege them as though fully set forth herein.

248.    On January 15, 1999, the MMG Fund, managed by MMG, and NEXGEN executed a confidentiality agreement.

249.    Pursuant to the confidentiality agreement between the parties, NEXGEN agreed to share NEXGEN proprietary information with MMG.  MMG agreed that it would only use the proprietary information to the extent necessary to assist in considering an investment in NEXGEN.

250.    MMG breached the agreement disclosing, without NEXGEN's knowledge or consent, confidential intellectual property, financial information, and contract and custom data to NEXGEN's competitor, eScout, EZCertify, and SBA officials.

251.    As a direct and proximate result of MMG's breach of the confidentiality agreement, in August 2003, the SBA canceled the contracts that had been awarded to NEXGEN.

252.    As a direct and proximate result of MMG's breach of the confidentiality agreement, NEXGEN has incurred damages.

WHEREFORE, NEXGEN and Howlette demand judgment against MMG and MMG Fund in an amount no less than $5,000,000.00 as compensatory damages, and such other relief as the Court deems appropriate and just.

**JURY TRIAL DEMANDED AS TO ALL ISSUES SO TRIABLE**

Respectfully submitted,

By:_____

Ronald M. Levin, Esq.
Steven D. Cundra, Esq.
Counsel for Counterclaimants Nexgen
Solutions, Inc., and Nexgen.Commerce, Inc.
and Plaintiff Edward Lee Howlette

Hall, Estill, Hardwick, Golden, Gable & Nelson
1120 20th Street, N.W.
Seventh Floor, North Building
Washington, D.C. 20036
(202) 973-1200
(202) 973-1212 (fax)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing document was electronically mailed and mailed, postage pre-paid this 24th day of May, 2006, to:

William H. Murphy, Jr.
Andrew J. Toland III
William H. Murphy, Jr. & Assoc., P.A.
12 West Madison Street
Baltimore, Maryland 21201

*Counsel for Plaintiffs*

Sarah Watson
Legal Assistant
Hall, Estill, Hardwick, Gable, Golden & Nelson
1120 20th Street, N.W.
Suite 700N
Washington, D.C. 20036
(202) 973-1200