UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| Edward L. Howlette, Jr. | * |
| | * |
| And | * |
| | * |
| NEXGEN, Solutions, Inc. | * |
| | * |
|     Plaintiffs | * |
| | * |
| v. | * Case No. 1:09- CV-00600 CCB |
| | * |
| Hall, Estill, Hardwick, Gable, | * |
|    Golden & Nelson, | * |
|     A Professional Corporation | * |
| | * |
| | * |
|     Defendant. | * |
| | * |
| | * |

## FIRST AMENDED COMPLAINT

Edward L. Howlette, Jr. (hereinafter, "Howlette") and NEXGEN Solutions, Inc., (hereinafter, "NEXGEN") by and through undersigned counsel, complain and allege as follows:

### The Parties

1. Howlette is an individual residing in Maryland at 2986 Turtle Creek Road in Laurel, Maryland, was and is today the President and CEO of NEXGEN. At all material times, Howlette was the principal shareholder, President, and CEO of NEXGEN

2. NEXGEN is a corporation organized under the laws of Delaware with its principal offices located at 2986 Turtle Creek Road in Laurel, Maryland. Between 1996 and 2001, NEXGEN developed a unique and innovative software program designed to revolutionize and

1

streamline procurement procedures for small businesses and federal agencies working under the auspices of the United States Small Business Administration (hereinafter, "SBA").

3. Hall, Estill, Hardwick, Gable, Golden & Nelson ("Hall Estill") is a professional corporation formed under the laws of the State of Oklahoma, and at all times relevant to this complaint, held itself out to be a national law firm capable of undertaking and prosecuting cases "before all State and Federal Courts and Agencies" including courts in the State of Maryland. Hall Estill maintains an office at 1120 20th Street, NW Suite 700, North Bldg., Washington, DC 20036 and offices in Oklahoma.

### Other Entities

4. Meridian Management Group, Inc., Community Development Ventures, Inc., Morgan Advisory Group, LLC, MMG Ventures, L.P., Stanley Tucker, Anthony Williams, Catherine Lockhart, and Timothy Smoot (collectively "MMG") were lenders to (and ultimately active business partners of) Plaintiffs' in connection with a series of innovative businesses developed by Plaintiffs.

5. The Maryland Small Business Development Financing Authority ("MSBDFA") is an agency of the State of Maryland managed by MMG under contract with the State of Maryland.

6. The Department of Business and Economic Development ("DBED") is an agency of the State of Maryland and responsible for the oversight and management of MMG as an agent of the state responsible for the MSBDFA.

7. The entity once known as eScout (now doing business as "Perfect Commerce") was a large competitor of NEXGEN in the electronic commerce industry that was not eligible to participate in Section 8(a) programs.

## Jurisdiction and Venue

8. This Court has jurisdiction as it is a civil action where the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states. The case was originally filed in the Circuit Court for Baltimore City, Maryland, Case no. 24-C-09-001038 and was ultimately removed to this Court by the Defendant.

## Background

10. NEXGEN is a small, minority owned business which was operating as a SBA certified 8(a) Program participant.

11. NEXGEN is a computer software and internet application developer. NEXGEN identified an opportunity to assist tens of thousands of small businesses in complying with Federal government procurement contracts by streamlining the procurement process for small businesses, thus making it easier for small businesses to provide goods and services to the Federal government.

12. NEXGEN developed an e-commerce platform, known as SBAExchange, to address the needs of the SBA and other Federal agencies to procure needed goods and services from small businesses.

13. In late 1999, NEXGEN approached the SBA with an unsolicited offer to develop and implement the e-commerce platform for government procurement programs.

14. In October of 2000, the SBA, through the 8(a) Program, awarded a contract to NEXGEN to develop and operate a website through which Federal agencies could efficiently locate, qualify, and conduct procurement from small businesses consistent with Federal procurement regulations and individual agency spending limits and objectives (hereinafter, "the

Contract"). This website was the foundation of a new Federal program to be rolled out nationwide by the SBA called SBAExchange.

15. Under the terms of the Contract NEXGEN would have received millions of dollars in registration fees from the small businesses registered to participate in the new program and a two percent per transaction fee for all transactions processed through the SBAExchange program.

16. The Defendant placed a value of the Contract to be worth approximately $84,500,000 to the plaintiffs over the life of the contract.

17. To help fund the contracts with the SBA to develop, service and maintain the SBAExchange program, Howlette and NEXGEN entered into a series of lender arrangements with MMG and associated entities, including the State of Maryland through the MSBDFA (operated by MMG).

18. In 1999, NEXGEN obtained financing from the MSBDFA to aid in the growth and expansion of the NEXGEN including the development and testing of the software used to create the SBAExchange program. MMG, as the agent for the State of Maryland, approved and made a series of loans to NEXGEN.

19. Between 1999 and 2003, NEXGEN and Howlette struggled to advance their work and business under the above-described SBA contract with MMG as the lender.

20. In early February, 2002, Perfect Communications (then eScout), learning of the SBAExchange contract, had a meeting with MMG and SBA and using political influence, began a process of trying to undermine NEXGEN's position and substitute itself for all or part of the

SBAExchange contract in direct violation of the SBA certification 8(a) program contract performance regulations.

21. eScout engaged in intentional and improper communications with SBA, Members of Congress, the White House Office of Management and Budget, and MMG calculated to cause damage to NEXGEN's relationship with its biggest customer by creating doubt in the SBA and its largest investor, MMG, as to NEXGEN's ability to perform its contract with the SBA.

22. eScout's actions led to SBA's termination of the contract with NEXGEN, resulting in NEXGEN's lost opportunity to at least $84 million in profits and to the frustration and ultimate destruction of the relationship between NEXGEN and MMG/MSBDFA.

23. By May 2003, the relationship between NEXGEN and MMG had deteriorated to the point that MMG was threatening Howlette and NEXGEN with an effort to take control of NEXGEN and in part, to substitute eScout for a substantial part, if not all, of the SBAExchange contract.

24. In response to this threat, Howlette and NEXGEN contacted the law firm of O'Rourke & Cundra to investigate the possibility of bankruptcy protection and a lender liability claims. (The term lender liability claims, hereinafter refers to all lender liability claims, including the claims against eScout comprised of tortious interference with a contract and tortious interference with a business advantage).

25. Plaintiffs and O'Rourke & Cundra entered into an attorney/client contract by which:

    A. Howlette would prepare and file a *pro se* Chapter 13 bankruptcy petition;

    B. O'Rourke & Cundra would represent Howlette in bankruptcy including any contested matters and adversary proceedings; and,

C. O'Rourke & Cundra would represent Howlette and NEXGEN in drafting and pursuing lender liability claims.

26. The actions of MMG and eScout ultimately led to the frustration and damage to the relationships between NEXGEN and the SBA, State of Maryland, the U.S. Air Force, SMART Technology, IBM and even several of NEXGEN's employees.

27. Howlette did not have many creditors or significant assets. The strategic legal plan was for Howlette to file bankruptcy to prevent the efforts of MMG to seize ownership of NEXGEN and use the bankruptcy as a means to conduct discovery that could be later used to force MMG into a settlement situation and/or greatly reduce the fees necessary in the lender liability actions. 28. An additional, legal strategy for Howlette and NEXGEN, from the start, was to position MMG into a settlement through aggressive early stage litigation prior to or in parallel with efforts to settle with the SBA for its breaches of contract with NEXGEN and to settle claims plaintiffs had with eScout and the State of Maryland.

29. In early 2004, O'Rourke & Cundra merged with the firm of Hall Estill. Hall Estill held itself out as a national litigation firm highly competent to appear in Maryland courts and represent Plaintiffs in a proactive, efficient and cost effective way using high tech methods to produce a top quality legal product and to achieve a quick and decisive victory for Plaintiffs.

30. On May 11, 2004, Hall Estill filed with the Bankruptcy Court, a Disclosure of Compensation of Attorney for Howlette in which Hall, Estill acknowledged receipt of the retainer of $5,000 and a per hour charge of $250 which had been agreed to by the parties. Hall Estill admitted that the retainer had been received from Howlette on or about August 13, 2003, relating back to the funds paid to O'Rourke & Cundra by NEXGEN to secure representation in

order to draft a complaint against MMG and its related entities. Thus Hall Estill knew about the retainer agreements between Howlette, NEXGEN and O'Rourke & Cundra which were either filed with the bankruptcy court or accompanied the $5,000 retainer.

31. When Howlette and NEXGEN became clients of Hall Estill in the spring of 2004, Hall Estill made no attempt to alter or modify the terms of the "Not To Exceed $25,000 contracts" that Howlette and NEXGEN had with O'Rourke & Cundra, or to have Howlette or NEXGEN sign a modified retainer agreement. Howlette and NEXGEN proceeded on the reasonable relief that the retainer agreement from O'Rourke & Cundra remained in operation.

32. Near the start of the relationship with Hall Estill, Howlette provided two draft lender liability complaints against MMG, one prepared by Mr. Glen Garnes, Esq., NEXGEN's corporate counsel, and one by Ms. Kelly McCloskey, Esq., a partner for O'Rourke & Cundra. Howlette made clear his desire to have Hall Estill update and add to either or both of these draft complaints in order to minimize the time and expense necessary to draft and file a lender liability complaint.

33. Through email communications on or about October 6, 2004, approximately six months after becoming a Hall Estill client, Howlette received information that Hall Estill assigned attorney John McDermott and at least one other attorney to the task of examining and preparing a lender liability action against MMG and other entities. The email stated that the attorneys had completed a review of the documents. Howlette believed a complaint would be drafted and filed shortly thereafter.

34. Hall Estill ignored the reasonable request to utilize previously prepared draft complaints as a starting point for drafting the lender liability complaint and decided to start fresh,

7

duplicating work done by two other attorneys, and substantially adding to the time and expense necessary to bring the lender liability action to court.

35. Beginning in January 2005, nine months after becoming a Hall Estill client, Howlette began questioning Hall Estill attorneys about when the lender liability complaint would be drafted, complaining that it was taking too long to get the complaint drafted and ready for filing as well as reminding Hall Estill of the overall legal strategy which had not been changed.

36. By February 2005, Howlette, worried that statutes of limitations would expire, again questioned Hall Estill as to when the lender liability case including the eScout case would be filed. No response was forthcoming.

37 After repeated questioning by Howlette, on June 2, 2005, Hall Estill informed Howlette, in writing, that depositions in the lender liability action would take place on or before July 13, 2005.

38. Sometime during 2005, after the lender liability case had languished for the better part of two years, Hall Estill assigned another attorney, Richard Schwartzman, to the lender liability case. Hall Estill informed Howlette that Schwartzman was a "big gun," an experienced lender liability litigator with extensive experience in government contracting as well.

39. In September of 2005, Hall Estill demanded that Howlette and NEXGEN make a $5,000 payment *in order to draft and file a complaint against MMG*. Howlette objected to this payment since Hall Estill had by this point nearly two years, two draft complaints in their possession to work from and a previously paid retainer of $5,000 from NEXGEN specifically to prepare and file the lender liability complaint. However, desperate to get the case started,

Howlette made the $5,000 payment under protest with the understanding that a complaint would be drafted.

40. Without prior notice or discussion, on October 14, 2005, Howlette received, along with another demand for a $5,000 payment by NEXGEN, and a new proposed retainer agreement. Despite prior communications from Hall Estill to the effect that a complaint was already being drafted, Hall Estill demanded that both NEXGEN and Howlette personally sign a new retainer agreement **before** proceeding with the MMG litigation, which included the drafting of the MMG complaint. Hall Estill indicated that the new retainer agreement was necessary for them to represent the interests of NEXGEN because the complaint (which Howlette had not seen) would be addressing many claims that belonged to NEXGEN alone, in addition to claims on behalf of Howlette personally. At this point, Hall Estill claimed the previous $15,000 in retainer fees were for Howlette's personal representation. However, the original retainer agreement prepared by O'Rourke & Cundra, which was assumed by Hall Estill by performing work under its terms, indicated that NEXGEN was represented in a lender liability action.

41. In November of 2005, Howlette agreed to sign the amended retainer agreement on behalf of the Companies but not as an individual, and NEXGEN agreed to pay an additional retainer of $5,000 upon the following conditions:

A. Hall Estill agreed that the $5,000 payment to be paid by NEXGEN would cover the cost of drafting and filing the MMG complaint on or before December 15, 2005

B. Hall Estill also agreed that the retainer would be used to conduct initial depositions in the MMG litigation.

42. On or about December 9, 2005, Hall Estill filed on behalf of Howlette in the bankruptcy court a consent motion to stay the confirmation of Howlette's reorganization plan and to temporarily allow the claims of MMG in the Howlette bankruptcy. The effect of this motion and other actions taken by Hall Estill in the Howlette bankruptcy was that the resolution of the lender liability suit became necessary before Howlette could exit bankruptcy.

43. In the December 9 motion to the bankruptcy court, Hall Estill stated that the lender liability complaint would be filed on or before December 15, 2005. This information telegraphed the litigation strategy to MMG's counsel, who was receiving notices and filings in the bankruptcy case.

44. At the time of the December 9 motion, no lender liability complaint had been prepared and presented to Howlette for review. There was also no indication or conversations with Howlette that would indicate that a complaint was in the drafting stages.

45. On the afternoon of December 14, 2005, Hall Estill presented to Howlette an utterly unacceptable, indeed incompetent, lender liability complaint for the MMG litigation. Despite having been provided two separate, previously prepared complaints drafted by two different attorneys, the complaint Hall Estill produced spanned a mere four pages in length, did not address all the parties against whom claims were being brought (eScout) and contained not one claim that belonged to NEXGEN, despite Hall Estill's previous representations regarding the need for the November 2005 retainer agreement and fee.

46. Howlette spent the day before the presentation of the December 14 complaint still explaining the facts of the case to Richard Schwartzman. However, the December 14 complaint was presented to Howlette as the complaint that would be filed.

47. Howlette informed Hall Estill orally and in writing not to file the December 14 complaint and that filing an amended complaint was not acceptable. Some additions were made to the December 14 draft complaint and despite Howlette's instructions, Hall Estill attempted to file the updated, but still incomplete and factually incorrect, complaint, on December 15, 2005 with the United States Bankruptcy Court for the District of Maryland.

48. Hall Estill failed to properly file or serve the December 15 complaint on MMG and other defendants, a fact Hall Estill only discovered weeks later after repeated questioning by Howlette.

49. On or about January 8, 2006, the Bankruptcy Court struck the December 14 complaint from its docket for failure to follow proper procedures in that court.

50. On December 23, 2005 MMG served Howlette with a Complaint against NEXGEN filed in the Circuit Court for Baltimore City which Howlette immediately provided to his lawyers at Hall Estill.

51. Hall Estill informed Howlette that no answer to the complaint filed by MMG was necessary since Hall Estill was preparing a motion to have the MMG complaint against NEXGEN moved to the Bankruptcy court and consolidated with Howlette's personal bankruptcy and the December 14 complaint. However, such motion was not filed until February 8, 2006, sixteen days after the answer was due according to Court rules.

52. By January 31, 2006, Hall Estill had failed, after over 22 months of representation, to produce and serve a complaint recognized by a court upon MMG and other parties in the lender liability action on behalf of NEXGEN despite being contracted to do so.

53. In early 2006, Richard Schwartzman, the Hall Estill attorney assigned to draft the lender liability complaint, was removed from working on the litigation. Howlette was informed that Steve Cundra was being assigned to the case. Ironically, Cundra was one of the attorneys Howlette had worked with at O'Rourke & Cundra. Howlette later learned that the new attorneys assigned to the lender liability case considered Mr. Schwartzman's work and notes completely unusable.

54. eScout, SBA and the State of Maryland were all included as defendants in the Complaint drafted by Cundra on behalf of the Plaintiffs, However, on May 12, 2006 eScout, SBA and the State of Maryland were removed as potential defendants by Cundra.

55. On May 15, 2006, in response to questions by Howlette as to why eScout, SBA and the State of Maryland were removed from the Complaint, Hall Estill told Howlette "they were not viable claims."

56. Hall Estill intentionally misled Howlette and NEXGEN about strength of the tortious interference claims against eScout, SBA and the State of Maryland as these claims were strong claims, but only rendered "not viable" as Hall Estill had allowed the statute of limitations to lapse for each of these potential defendants.

57. Hall Estill intentionally misled the Plaintiffs to shield Hall Estill from potential liability for missing the statutes of limitations.

58. On May 24, 2006, Hall Estill finally prepared and filed a now Complaint/counter-complaint in the lender liability action, almost three years after Howlette and the NEXGEN companies had retained O'Rourke & Cundra and despite having access to two previously drafted complaints. The Counter-claim was filed six months after the MMG complaint was initially

12

filed against NEXGEN. By this time Hall Estill had assigned no less than five attorneys to prepare the lender liability action, with no explanation for the lengthy delays in preparing the complaint or the exorbitant fees charged which greatly exceeded the rates agreed to by the parties and disclosed to the bankruptcy court in the required 2016 disclosure statement filing.

59. Upon information and belief, Hall Estill badly mishandled the process of consolidation and removal of the disparate lender liability actions and suit by MMG. Hall Estill first removed all actions to the Bankruptcy Court and then asked the Bankruptcy Court to remand the actions to the Circuit Court of Baltimore City and then had the cases consolidated in the Baltimore City Circuit Court.

60. The failure for 26 months of representation of Howlette and NEXGEN by Hall Estill to prepare, file and serve a proper complaint upon MMG and other parties resulted in the lapsing of the statute of limitations on causes of action against the State of Maryland, Small Business Administration and eScout.

61. After regular questioning as to why the lender liability complaint focused only on MMG, Hall Estill admitted that the statutes of limits as to eScout and the State of Maryland entities, MSBDFA and DBED, had lapsed.

58. The lawsuit against the MMG entities was eventually settled for a small amount of money compared to its value, after Hall Estill forced Howlette to refinance his home (an asset of the bankruptcy estate) to pay fees which according to Hall Estill representations were not part of the bankruptcy estate, and then withdrew as counsel without proper notice and left the plaintiffs in a poor position to continue the litigation or negotiate a settlement.

## COUNT I--Breach of Contract

62. Paragraphs 1-61 are incorporated herein as if stated fully.

63. Plaintiffs and O'Rourke & Cundra had a contract to represent Howlette in bankruptcy and Howlette and NEXGEN in their lender liability actions, including the case of tortious interference with a contract by eScout.

64 Upon the merger of Hall Estill and O'Rourke & Cundra, Hall Estill assumed the contract with Howlette and NEXGEN by performing work on the contract without disputing the prior terms, seeking to negotiate a new retainer contract or seeking to clarify the contract terms.

65 Howlette and NEXGEN performed all of their obligations on the contract, including several obligations under protest and/or duress.

66 Hall Estill breached the agreement with Howlette and NEXGEN in many ways, including, but not limited to failing to adequately investigate the direct involvement by eScout in the termination of the SBA contract, failing to file suit against or reach settlement with eScout or the State of Maryland before the statute of limitations ran and failing to properly communicate with the Plaintiffs on important matters related to the representation.

67. Howlette and NEXGEN have suffered damages as a result of Hall Estill's breach of its contractual obligations, including but not limited to damages from the lost claims against eScout and the State of Maryland due to the running of the statute of limitations.

**WHEREFORE** Howlette and NEXGEN demand judgment against Hall Estill for compensatory and consequential damages in the amount of $7,000,000.00, attorney's fees, costs, pre-and post-judgment interest, and such other damages as this Honorable Court shall deem just and proper.

### COUNT II– Legal Malpractice

68. Paragraphs 1-67 are incorporated herein as if stated fully.

69 Hall Estill had a contractual relationship with Howlette and NEXGEN to provide legal services.

70. Hall Estill held itself out to the public at large, and to the Plaintiffs in particular as experienced counsel in the field of litigation of disputed business claims. 7168. Plaintiff reasonably relied on the representations of Hall Estill and its predecessor firm and engaged the Defendants to pursue the MMG entities including eScout for its tortious interference with the SBA contract.

72. As a law firm and attorneys experienced in the field of litigation, it was incumbent upon the Defendant to exercise that degree of care and skill expected of a reasonably competent law firm or attorney under similar circumstances in pursuing litigation interests of their client.

73. Hall Estill violated the standard of care by allowing the statute of limitations to run with regard to the Plaintiff's claims of tortious interference with a contract and tortious interference with a business advantage without either settling Plaintiff's claims or filing a law suit to protect their interests, by misleading Plaintiffs with regard to the reasons for removing eScout, SBA and the State of Maryland as potential defendants, by failing to investigate the role of eScout in the termination of the SBA contract, and by failing to maintain proper communications with its clients..

74 As a result of the breach of the standard of care, Plaintiffs have lost their rights to pursue the claims of tortious interference with a contract and tortious interference with a business advantage against eScout and those claims are forever barred.

75 As a direct and proximate result of the breach of the standard of care by the Defendant, Plaintiffs have suffered economic loss in the amount of $7,000,000.

**WHEREFORE,** Howlette and NEXGEN demand judgment against Hall Estill for compensatory and consequential damages in the amount of $7,000,000.00, attorney's fees, costs, pre- and post-judgment interest, and such other damages as this Honorable Court shall deem just and proper.

Respectfully Submitted,
FRED B. GOLDBERG, P.C.

//s//Fred B. Goldberg
Fred B. Goldberg, Esq.
7101 Wisconsin Avenue
Suite 1201
Bethesda, MD 20814
301-654-3300 (voice)
301-654-1109 (fax)
FBG@fredbgoldberg.com

Attorney for Plaintiff